66 F.3d 483
 UNITED STATES of America, Plaintiff-Appellee,
v.
ALL ASSETS OF G.P.S. AUTOMOTIVE CORP., Real Property and
Premises known as 156 Peconic Ave., Medford, NY, District
0200, Section 773.00, Block 01.00, Lots 5.20, 6.00 and 10.00
on the Suffolk County Tax Map, Defendant-Appellant,
Philip Schaffer, Sr., Grace Schaffer & Philip J. Schaffer,
Claimants-Appellants.
 No. 616, Docket 94-6115.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 21, 1994.
Decided Sept. 18, 1995.
Rehearing Denied Dec. 5, 1995.
 
 Neufeld & O'Leary, New York City (David Neufeld, Denis O'Leary, of counsel) for appellants G.P.S. Automotive Corp., Philip Schaffer, Sr. and Grace Schaffer.
 Gino Josh Singer, New York City, for appellant Philip J. Schaffer.
 Gary Brown, Asst. U.S. Attorney, Brooklyn, NY (Zachary W. Carter, U.S. Attorney for the Eastern District of New York, Deborah Zwany, August Sellitto, Asst. U.S. Attorneys, Deborah Fanning, Special Asst. U.S. Attorney, of counsel) for appellee.
 Before: ALTIMARI, LEVAL, and CALABRESI, Circuit Judges.
 CALABRESI, Circuit Judge:
 
 
 1
 In rem civil forfeiture, though civil in name, is actually a cross-breed of the criminal and civil law. It is therefore not surprising that recent Supreme Court decisions have indicated that the Eighth Amendment and the Double Jeopardy Clause of the Fifth Amendment, constitutional safeguards usually associated only with criminal defendants, provide some protection for those whose property is subject to confiscation in civil forfeiture proceedings. The effect that these constitutional protections have on such proceedings is anything but obvious, however, especially since the Supreme Court has expressly left to the Courts of Appeals the task of working out the implications of its decisions in this area.
 
 
 2
 We are confronted with both Eighth Amendment and double jeopardy issues in the appeal of G.P.S. Automotive Corporation ("GPS"), Philip J. Schaffer ("Phil Schaffer"), Philip Schaffer Sr. ("Skip Schaffer"), and Grace Schaffer from a judgment entered by the United States District Court for the Eastern District of New York (Leonard D. Wexler, Judge) that ordered the forfeiture of GPS's assets and associated real property owned by the Schaffers. In addition to claiming that there was insufficient evidence to support a forfeiture, the appellants assert that the forfeitures ordered by the District Court violate the Eighth Amendment's Excessive Fines Clause, and that the forfeitures against Phil Schaffer and GPS transgress the Fifth Amendment's Double Jeopardy Clause.
 
 
 3
 We find that the evidence developed below supported the orders of forfeiture. We also find, however, that the claim based on the Double Jeopardy Clause calls for more fact-finding in the District Court before it can be resolved. We likewise find that the claim based on the Excessive Fines Clause requires further consideration after additional fact-finding. Consequently, we vacate the forfeiture orders and remand the case for further proceedings.
 
 BACKGROUND
 
 4
 Since its inception, GPS, an automotive salvage and repair shop in Medford, New York, has been jointly owned by Skip Schaffer, his wife Grace Schaffer, and their son Phil Schaffer. The three Schaffers also own jointly two of the three parcels of land upon which GPS is located, and the corporation itself owns the third. Both father and son have been responsible for the overall operations of GPS, and the son served as president of the company through 1992.
 
 
 5
 In June 1990, Suffolk County police began an investigation of GPS after Brian Hoffner, a former GPS employee and convicted car thief, told authorities that he had been selling stolen car parts to GPS on a regular basis since 1980. Hoffner assisted the police investigation of GPS by telephoning Phil Schaffer to set up deals for stolen cars or insurance "give-ups"--schemes in which a car's theft is arranged to enable the filing of a false insurance claim. Hoffner thereafter delivered a Corvette and additional car parts to the GPS yard, and Phil Schaffer, apparently believing the car and parts to be from insurance give-ups, paid Hoffner for his efforts.
 
 
 6
 Subsequently, Suffolk County police officers executed three search warrants at the GPS yard. The police seized numerous cars, trucks and parts with obliterated or removed vehicle identification numbers ("VINs"). The police also found a few preserved VINs in the GPS yard, and these identification numbers were traced back to eight vehicles that had been reported stolen. Also seized during the search were GPS's financial records. These records included a number of irregular entries--e.g., disbursements to fictitious businesses and parts' transactions without the usual notation of invoice numbers or VINs.
 
 
 7
 On this evidence, Phil Schaffer and GPS were tried and convicted in New York state court on multiple counts of criminal possession of stolen property, illegal possession of VINs, and falsifying business records. Phil Schaffer was sentenced to 1.33 to 4 years of imprisonment and GPS was fined $10,000.
 
 
 8
 In January 1991, the Government filed the instant in rem civil forfeiture action, pursuant to 18 U.S.C. Sec. 981. The Government sought all the assets of GPS as well as the parcels of land upon which it is located. It based its forfeiture demand on alleged violations of the statutes prohibiting trafficking in vehicles or parts with tampered VINs, see 18 U.S.C. Sec. 2321, and money laundering, see 18 U.S.C. Sec. 1956. The Government maintained that GPS had conducted a large-scale trade in stolen car parts and had falsified business records to conceal such transactions.
 
 
 9
 The appellants joined the litigation by filing claims of ownership to the defendant properties. Prior to trial, Grace Schaffer and Skip Schaffer moved for summary judgment dismissal, claiming that the Government's evidence in support of forfeiture was insufficient as a matter or law. GPS and Phil Schaffer made a separate motion to dismiss on the ground that, after their convictions in state court, the Government's forfeiture action was barred by the Fifth Amendment's Double Jeopardy Clause. These claims were rejected by the District Court, and the case proceeded to trial.
 
 
 10
 In January 1994, after a five-day bench trial, the District Court issued detailed Findings of Fact and Conclusions of Law. The Court held that "GPS regularly and continuously engaged in transactions involving illegal vehicles and parts wiped clean of [VINs] to render them untraceable." Findings of Fact and Conclusion of Law, United States v. All Assets of G.P.S. Automotive Corp., No. 91-0223, at 11 (E.D.N.Y. Jan. 26, 1994). It also found that GPS made payments to "fictitious names and businesses to conceal the nature and sources of the illegal vehicles and parts" and "served as a conduit for the proceeds of the illegal transactions." Id. at 11-12. The Court concluded that these transactions were "handled primarily by Phil Schaffer," that "Skip Schaffer was fully aware of the illegal transactions," but that "Grace Schaffer had no knowledge of the commission of the illegal transactions." Id. at 10.
 
 
 11
 Based on these determinations, the District Court ruled that the assets of GPS and the real property interests of Skip Schaffer and Phil Schaffer were to be forfeited to the Government. The Court held, however, that Grace Schaffer was an "innocent owner," and hence should not have her interest in the real property forfeited. It then scheduled a hearing to determine the extent of Grace Schaffer's interest in the defendant properties. Prior to this hearing, and upon the parties' motion, the District Court certified the matter for immediate appeal, pursuant to Fed.R.Civ.P. 54(b), and entered a partial judgment.
 
 DISCUSSION
 
 12
 Title 18 U.S.C. Sec. 981 provides, inter alia, that any "property, real or personal, involved in a transaction or attempted transaction in violation of ... section 1956 or 1957 of this title [the federal money-laundering statutes], or any property traceable to such property" is subject to forfeiture to the United States. 18 U.S.C. Sec. 981(a)(1)(A). The Government's complaint claimed that the defendant property had been used to facilitate violations of 18 U.S.C. Sec. 1956, through GPS's transactions that involved motor vehicles and parts with tampered VINs, and that the latter was itself a violation of 18 U.S.C. Sec. 2321.[1]
 
 I. Evidence Supporting Forfeiture
 A. Illegal Activity
 
 13
 The appellants contend that the Government failed to present sufficient evidence to establish violations of the statutes prohibiting money laundering and trafficking in parts with tampered VINs. Given the allocation of burdens in civil forfeiture actions and the proof introduced at trial, however, such claims are unavailing.
 
 
 14
 To support a forfeiture under 18 U.S.C. Sec. 981, the Government initially needs only to establish "probable cause," i.e. some reasonable grounds, to believe that there is a nexus between the defendant property and illegal conduct. See Marine Midland Bank, N.A. v. United States, 11 F.3d 1119, 1126 (2d Cir.1993); see also United States v. Daccarett, 6 F.3d 37, 55-56 (2d Cir.1993) (applying the analogous forfeiture provision of 21 U.S.C. Sec. 881), cert. denied, --- U.S. ----, 114 S.Ct. 1294, 127 L.Ed.2d 648 (1994). Once the Government has made such a showing, the burden shifts to the claimant to show, by a preponderance of the evidence, that the defendant property was not in fact used unlawfully and hence is not subject to forfeiture. See Daccarett, 6 F.3d at 57; United States v. 4492 South Livonia Road, 889 F.2d 1258, 1267 (2d Cir.1989).
 
 
 15
 In view of these standards, the evidence developed at trial was more than sufficient to support the forfeiture orders. Informant Hoffner testified about his many sales of stolen vehicles and components with removed VINs to GPS. Among these were several unlawful transactions conducted with Phil Schaffer during the Suffolk County police investigation. In addition, the Government showed that numerous cars and parts found in the GPS yard had removed or altered VINs, and that the VINs found intact on GPS's premises belonged to vehicles that had been reported stolen. Finally, a former bookkeeper for GPS testified to GPS's irregular transactions with certain "suppliers" of parts, and her testimony was corroborated through the introduction of GPS's business records.
 
 
 16
 This direct and circumstantial evidence easily satisfies the Government's initial burden of showing "probable cause" that there was a nexus between the defendant properties and trafficking in VIN-altered auto parts and money laundering. And since the claimants presented nothing to refute this ample evidence, it is just as plain that at trial they failed "to establish that the factual predicates for forfeiture had not been met." United States v. 15 Black Ledge Drive, 897 F.2d 97, 102 (2d Cir.1990). Accordingly, we hold that there was sufficient evidence for the District Court's orders of forfeiture.
 
 B. Innocent Ownership
 
 17
 Title 18 U.S.C. Sec. 981 provides that a claimant can avoid forfeiture of his or her property if the illegal activity that serves as the forfeiture's predicate can be shown "to have been committed without the knowledge of that owner," that is, if the claimant is an "innocent owner." 18 U.S.C. Sec. 981(a)(2). Once again, though, after the Government has established a connection between the defendant property and illegal activity, the burden is on the claimant to show that he or she did not know of the illegal activity. See id.; see also United States v. 755 Forest Road, 985 F.2d 70, 72 (2d Cir.1993) (applying the analogous provision of 21 U.S.C. Sec. 881) ("The so-called 'innocent owner' defense is an affirmative defense to be proven by the owner-claimant.")
 
 
 18
 The District Court found that Grace Schaffer--Skip Schaffer's wife--qualified as an "innocent owner," and Skip Schaffer argues that his interest in the defendant property should not be subject to forfeiture for the same reason. He claims that the evidence at trial showed that he had limited involvement in GPS's operations after an illness in the early 1980s. He further notes that informant Hoffner's testimony indicated that Hoffner arranged transactions for stolen parts only with Phil Schaffer. Finally, Skip Schaffer highlights the fact that both he and his wife testified at trial that he was completely unaware of whatever illegal activity may have been taking place at GPS.
 
 
 19
 Despite the foregoing, the District Court, relying on circumstantial evidence indicating that Skip Schaffer knew what was going on, expressly concluded that "Skip Schaffer was fully aware of the illegal transactions" occurring at GPS. The trial evidence showed that, even after his illness, Skip Schaffer regularly worked at GPS at least three days a week, and that he was present in the yard when deliveries of stolen vehicles and parts were made. Moreover, though the Schaffers testified that Skip Schaffer was not aware of any illegal transactions, Grace Schaffer also testified that he was a "hands-on" owner who liked to be in the yard overseeing operations.
 
 
 20
 Since the District Court's factual findings may be disturbed only if they are clearly erroneous, and we are to show "due regard" for a trial court's assessment of the credibility of witnesses, see Fed.R.Civ.P. 52(a), we conclude that this evidence provides sufficient support for the District Court's holding. We find that the District Court's rejection of Skip Schaffer's claim of lack of knowledge was "plausible in light of the record viewed in its entirety," Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), and we therefore decline to set aside its conclusion that Skip Schaffer failed to establish an "innocent owner" defense.
 
 II. Double Jeopardy
 
 21
 Since they were prosecuted and convicted in state court for the illegal possession of VINs and for the falsifying of business records, Phil Schaffer and GPS contend that the Government's civil forfeiture action against their property is prohibited by the Double Jeopardy Clause of the Fifth Amendment. Before trying the merits of the Government's forfeiture action, the District Court rejected this contention in a detailed opinion that relied principally on the "dual sovereignty" doctrine. The District Court's analysis did not, however, give full consideration to certain factors that we now deem relevant to the resolution of this complex issue. As a result, we conclude that further fact-finding in the District Court will be required to resolve the appellants' double jeopardy claim.
 
 
 22
 The Double Jeopardy Clause provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This sensible and seemingly simple proscription has proven exceedingly difficult to apply in concrete cases.[2] This difficulty is manifested in the recent Supreme Court Double Jeopardy Clause jurisprudence concerning civil sanctions generally and forfeiture actions in particular. See Department of Revenue of Montana v. Kurth Ranch, --- U.S. ----, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) (applying the Double Jeopardy Clause to a tax assessment); United States v. Halper, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) (discussing the applicability of the Double Jeopardy Clause to a "civil" fine); see also Austin v. United States, --- U.S. ----, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (considering the application of the Excessive Fines Clause of the Eighth Amendment to civil forfeiture actions in the context of Halper ). The High Court has left it to the Courts of Appeals to develop the implications of these holdings. And determining what impact the Double Jeopardy Clause has in civil forfeiture cases, in the light of these decisions, proves to be an exceedingly complicated task.
 
 
 23
 A. Applying the Double Jeopardy Clause to Civil Forfeiture
 
 
 24
 The first question that must be addressed is simply: When and to what extent will in rem civil forfeitures be precluded by the Double Jeopardy Clause? Unfortunately, the Supreme Court cases give no clear answer to this fundamental question.
 
 
 25
 Not long ago, Supreme Court rulings strongly indicated that the Double Jeopardy Clause would rarely apply in civil forfeiture proceedings. In United States v. One Assortment of 89 Firearms, 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984), the Court held that the Double Jeopardy Clause did not bar a forfeiture of guns under 18 U.S.C. Sec. 924(d) after the claimant had been acquitted on criminal firearms charges. See id. at 366, 104 S.Ct. at 1107. Applying the tests it developed in United States v. Ward, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980), and Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), the Court concluded that "the Sec. 924(d) forfeiture proceeding ... is not a criminal proceeding, [and so] it is not barred by the Double Jeopardy Clause." 89 Firearms, 465 U.S. at 366, 104 S.Ct. at 1107. See also One Lot Emerald Cut Stones and One Ring v. United States, 409 U.S. 232, 235-37, 93 S.Ct. 489, 492-93, 34 L.Ed.2d 438 (1972) (finding no double jeopardy bar on a forfeiture of illegally imported jewels under 19 U.S.C. Sec. 1497, after the owner had been acquitted on criminal charges for violating customs procedures, since "the Sec. 1497 forfeiture is civil and remedial" and so "involves neither two criminal trials nor two criminal punishments"). The thrust of the Court's holding in 89 Firearms seemed clear: the Double Jeopardy Clause precludes only successive criminal prosecutions, and thus it will not bar a forfeiture action brought after an initial criminal prosecution as long as the forfeiture action can properly be characterized as a civil proceeding.
 
 
 26
 But the Supreme Court's decision in United States v. Halper, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), changed matters drastically. See United States v. Millan, 2 F.3d 17, 19 (2d Cir.1993) (calling Halper the "seminal case in this realm of double jeopardy jurisprudence"), cert. denied, --- U.S. ----, 114 S.Ct. 922, 127 L.Ed.2d 215 (1994). In Halper, the Supreme Court focused on the "multiple punishment" component of the Double Jeopardy Clause and held that some sanctions or penalties, even if labelled "civil" and imposed in civil proceedings, may still constitute "punishment" for the purpose of double jeopardy analysis. See 490 U.S. at 440-48, 109 S.Ct. at 1897-1902. Regardless of the nature of the proceeding in which the sanction is imposed, a sanction that serves punitive goals, if imposed after another punishment for the same offense, runs afoul of "the Double Jeopardy Clause's proscription of multiple punishments." Id. at 447, 109 S.Ct. at 1901. For "under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." Id. at 448-49, 109 S.Ct. at 1901-02.
 
 
 27
 Because Halper arose in the context of a statutory penalty under the False Claims Act and barely mentioned the Supreme Court's prior civil forfeiture/double jeopardy decisions in 89 Firearms and One Lot Emerald Cut Stones, lower courts were left to determine for themselves what Halper meant for civil forfeiture actions. In United States v. 38 Whalers Cove Drive, 954 F.2d 29 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992), this Court had occasion to examine the implication of Halper for such proceedings. As in the instant case, the claimant in Whalers Cove had been criminally punished under state law for criminal conduct (two minor drug sales from his home) that the Government claimed provided grounds for the forfeiture of his property. He asserted that the Double Jeopardy Clause barred the forfeiture of his personal residence because it would constitute a second "punishment" under the terms of Halper.
 
 
 28
 After reviewing the Halper decision, we concluded that Halper "appl[ies] to civil forfeitures," such that "[f]orfeitures that are overwhelmingly disproportionate to the value of the offense must be classified as punishment unless the forfeitures are shown to serve articulated, legitimate civil purposes." Whalers Cove, 954 F.2d at 35. We noted that among the valid civil purposes for forfeiture are the removal of the instrumentalities of crime and the compensation of the Government for whatever enforcement expenditures or damages can be attributed to the criminal misconduct of the claimant. See id. at 35-36. At the same time, we recognized that some forfeitures can be punitive in nature. See id. at 36. We concluded that a court's task after Halper was "to examine whether the forfeiture at hand is fully justified by the civil and remedial purposes it ostensibly serves, or whether it or a portion thereof can be explained only with reference to punitive goals." Id.
 
 
 29
 Our analysis in Whalers Cove focused not upon the general characteristics of the statute under which the forfeiture was sought, but rather upon the specifics of the particular property forfeiture at issue. And we set out a detailed procedure for district courts to use in determining whether the forfeiture "at hand " constituted punishment. See Whalers Cove, 954 F.2d at 36-37 (emphasis added). Under Halper, this appeared to be the appropriate methodology, since the language used by the Supreme Court in Halper suggested that deciding whether a civil sanction constituted "punishment" involved an individualized determination turning on the specific circumstances surrounding the application of the sanction to a particular defendant. See Halper, 490 U.S. at 448, 109 S.Ct. at 1901-02 (explaining that "the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed"); id. (indicating that the inquiry concerns "the sanction as applied in the individual case"); id. at 447 n. 7, 109 S.Ct. at 1901 n. 7 (clarifying that "in determining whether a particular civil sanction constitutes punishment, it is the purposes actually served by the sanction in question, not the underlying nature of the proceeding giving rise to the sanction, that must be evaluated"); see also id. at 453, 109 S.Ct. at 1904 (Kennedy, J., concurring) (stressing that the Court's holding "constitutes an objective rule that is grounded in the nature of the sanction and the facts of the particular case").[3]
 
 
 30
 Relying on Whalers Cove, the Government argues that no double jeopardy problem exists in the instant case because the forfeiture of the property of GPS and Phil Schaffer was directed only to the "instrumentalities of crime," and therefore does not constitute "punishment" under Halper (as read by us in Whalers Cove ). And though, as discussed below, the District Court relied on other grounds in rejecting the double jeopardy claims of GPS and Phil Schaffer, its opinion suggests that it also adopted the Government's contention that the particular forfeitures at issue here did not constitute "punishment" and hence could not create double jeopardy problems. See Memorandum and Order, United States v. All Assets of G.P.S. Automotive Corp., No. 91-0223, at 7-11 (E.D.N.Y. July 10, 1992). Developments in the law since its decision, however, pose two significant difficulties for the notion that the forfeitures "at hand" are not punishment.
 
 
 31
 First, it is not obvious on this record that all of the property of GPS and Phil Schaffer that the Government seeks to have forfeited can properly be considered to have been an "instrumentality" of their criminal activities. GPS's and Phil Schaffer's state convictions certainly indicate that they conducted a large-scale trade in stolen vehicles and parts on this property, but it seems clear that they also ran a sizeable legitimate automotive salvage and repair business from the same premises. As a result, though much of the property at issue may apparently be deemed "the 'means' by which the crime was committed," United States v. $145,139, 18 F.3d 73, 75 (2d Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 72, 130 L.Ed.2d 27 (1994), it is questionable whether all of it may be so characterized.
 
 
 32
 Since the Supreme Court has recently cast doubt upon expansive definitions of what can qualify as instrumentalities of a particular crime, see Austin, --- U.S. at ----, 113 S.Ct. at 2811, we are not permitted automatically to accept a contention that all of the assets of a legitimate enterprise, as well as all of the real property upon which that enterprise is located, constitute instrumentalities of whatever crimes are committed on the premises. Cf. United States v. $69,292, 62 F.3d 1161, 1167-68 (9th Cir.1995) (expressing concerns about "stretch[ing] the fiction of an 'instrumentality' "). And since the District Court did not develop a factual record or rule directly on what could be deemed to have been instruments of the appellants' crimes, we cannot on appeal resolve the double jeopardy claim of GPS and Phil Schaffer by seeking to determine, for the first time in the case, whether all their properties did in fact constitute criminal instrumentalities.
 
 
 33
 Second, and more fundamental, it is by no means clear, given two very recent decisions by the Supreme Court, that the methodology we formulated in Whalers Cove for determining whether a particular civil forfeiture constitutes "punishment" for double jeopardy analysis remains good law. For Austin v. United States, --- U.S. ----, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), and Department of Revenue of Montana v. Kurth Ranch, --- U.S. ----, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994), may mean that the appropriate inquiry is no longer whether the particular forfeiture in the case at hand is remedial or punitive, but rather whether the statute upon which the Government relies for the forfeiture is itself remedial or punitive. In Austin, the issue was whether the Excessive Fines Clause of the Eighth Amendment applied to in rem civil forfeiture. In finding that the in rem civil forfeiture did constitute "punishment," the Court expressly focused on the statute, upon which the Government sought forfeiture, "as a whole." --- U.S. at ---- n. 14, 113 S.Ct. at 2812 n. 14 (emphasis added); see also id. at ---- - ----, 113 S.Ct. at 2810-12 (examining aspects of the forfeiture statute generally). In Kurth Ranch, the Supreme Court considered whether Montana's tax on illegal drugs constituted "punishment" so as to be barred by the Double Jeopardy Clause. Again, the Court examined Montana's tax statute generally and expressly avoided the particularized analysis it had applied in Halper. See --- U.S. at ---- - ----, 114 S.Ct. at 1944-48.
 
 
 34
 Because these recent decisions do not discuss methodology, we cannot be sure that Austin and Kurth Ranch intended to cast doubt upon the case-by-case approach we employed in Whalers Cove. And we are hesitant to conclude that the Supreme Court meant its decision in Austin, a case addressing the Excessive Fines Clause, to reformulate the standards Halper had established for the Double Jeopardy Clause. Similarly, Kurth Ranch 's avoidance of Halper 's individualized methodology may have been based solely on the fact that it "simply does not work in the case of a tax statute." --- U.S. at ----, 114 S.Ct. at 1948 (internal quotation omitted). Only if we read Austin and Kurth Ranch as making major changes in double jeopardy analysis, sub silento, would we have to conclude that Halper 's particularized approach to the question of "punishment" (which we adapted to civil forfeitures in Whalers Cove ) has been cast aside. And, in fact, rather than reading Austin or Kurth Ranch in this way, we have continued to follow Halper and to make individualized, case-by-case determinations of whether particular civil sanctions constitute "punishment" even after Austin and Kurth Ranch (albeit without discussion of these cases). See United States v. Carson, 52 F.3d 1173, 1182-83 (2d Cir.1995); United States v. Morgan, 51 F.3d 1105, 1112-15 (2d Cir.1995); United States v. $145,139, 18 F.3d 73, 75 (2d Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 72, 130 L.Ed.2d 27 (1994).
 
 
 35
 We must recognize, however, that the Ninth Circuit in a double jeopardy case has recently expressly held--and even more recently re-emphasized--that, after Austin, "in order to determine whether a forfeiture constitutes 'punishment,' we must look to the entire scope of the statute which the government seeks to employ, rather than to the characteristics of the specific property the government seeks to forfeit." United States v. $405,089.23, 33 F.3d 1210, 1220 (9th Cir.1994). Reading the Supreme Court's decision as directly rejecting a prior Ninth Circuit civil forfeiture/double jeopardy holding,[4] that Circuit concluded that Austin now requires a "categorical approach to 'punishment' determinations." Id. And, upon a petition for rehearing, the Ninth Circuit amended its opinion by adding that the "adoption of this categorical approach is also compelled by the Supreme Court's recent decision in ... Kurth Ranch." United States v. $405,089.23, 56 F.3d 41, 42 (9th Cir.1995) (text of amendment to original opinion). Applying this "categorical approach" in $405,089.23, the Ninth Circuit formally held that any forfeiture action under Sec. 981(a)(1)(A)--the statute employed by the Government in the case before us--constitutes "punishment" for purposes of the Double Jeopardy Clause. See 33 F.3d at 1221-22.
 
 
 36
 The Ninth Circuit's forceful opinion in $405,089.23--which it has declined to reconsider en banc, see 56 F.3d at 42, and which has gained adherents in other circuits, see United States v. Ursery, 59 F.3d 568, 572-73 (6th Cir.1995); see also United States v. Baird, 63 F.3d 1213, 1220-26 (3d Cir.1995) (separate opinion of Sarokin, J.)--may raise a question about the impact of Austin and Kurth Ranch on double jeopardy analysis in civil forfeiture cases. Nevertheless, while we think it is important to resolve the issue of how and when the Double Jeopardy Clause applies to civil forfeiture actions,[5] we believe we ought not do so at this stage of the proceedings in this case.
 
 
 37
 To try to reconcile Halper, Austin and Kurth Ranch with each other, and with the Supreme Court's earlier double jeopardy/civil forfeiture decision in 89 Firearms, we would have to fly blind. In their arguments to this Court, the parties have not really addressed these broad issues, but have instead focused almost exclusively on the dual sovereignty doctrine. They have done this both because that doctrine provided the essential foundation for the District Court's rejection of the appellants' double jeopardy claims, and because many of the broader jurisprudential developments discussed above occurred after this appeal was briefed and argued. We therefore do not yet have an adequate account of the parties' views on how these broader issues should be resolved in the context of this case.
 
 
 38
 Moreover, though we think further consideration of the issue is required after more fact-finding, the District Court may still determine, as it did originally, that the dual sovereignty doctrine makes the Double Jeopardy Clause inapplicable in this case. Our remand for additional fact-finding on the issue in no way precludes this. And a final determination that the dual sovereignty doctrine applies would, obviously, make superfluous any consideration of the broader double jeopardy issues implicated in this proceeding.
 
 
 39
 For all these reasons, we think the proper course is to avoid, for now, the resolution of these broad questions. We therefore leave open (1) whether the detailed methodology set forth in Whalers Cove for dealing with double jeopardy and forfeitures remains good law given recent Supreme Court holdings, and (2) whether, if Whalers Cove still governs on this issue, all the properties of GPS and Phil Schaffer constitute instrumentalities of their crimes. Such issues are to be considered in the first instance by the District Court, if, and only if, it were to conclude upon remand that the dual sovereignty doctrine does not dispose of the double jeopardy contentions of GPS and Phil Schaffer.[6] It is to dual sovereignty that we therefore now turn.
 
 B. Dual Sovereignty Doctrine
 
 40
 In Whalers Cove we explained: "The Double Jeopardy Clause is inapplicable when separate governments prosecute the same defendant, for the defendant has offended both sovereigns." Whalers Cove, 954 F.2d at 38. As this succinct explanation indicates, the "dual sovereignty" doctrine rests on the notion that a defendant whose conduct violates the laws of two sovereigns has "committed two different offenses by the same act, and [thus] a conviction by a court [of one sovereign] of the offense against that [sovereign] is not a conviction of the different offense against the [other sovereign] and so is not double jeopardy." United States v. Lanza, 260 U.S. 377, 382, 43 S.Ct. 141, 142-43, 67 L.Ed. 314 (1922).
 
 
 41
 Though first used by the Supreme Court to uphold a second prosecution in Lanza, the dual sovereignty doctrine was most prominently expounded in a pair of 1959 cases in which the High Court upheld a state prosecution following a federal acquittal for the same offense, see Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), and conversely upheld a federal prosecution following a state conviction, see Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959).[7] At the time, the Double Jeopardy Clause was considered inapplicable to the states, and the early cases applying the doctrine appeared to rely in part on this fact. See Bartkus, 359 U.S. at 123-39, 79 S.Ct. at 678-86; Abbate, 359 U.S. at 189-96, 79 S.Ct. at 667-71; Lanza, 260 U.S. at 382, 43 S.Ct. at 142-43. Nevertheless, the Supreme Court has continued to espouse the dual sovereignty doctrine as it had been developed in Bartkus, Abbate, and Lanza, even after states were found to be fully subject to the commands of the Double Jeopardy Clause. See Heath v. Alabama, 474 U.S. 82, 87-89, 106 S.Ct. 433, 436-38, 88 L.Ed.2d 387 (1985); United States v. Wheeler, 435 U.S. 313, 316-18, 98 S.Ct. 1079, 1082-83, 55 L.Ed.2d 303 (1978).[8]
 
 
 42
 GPS and Phil Schaffer recognize the obstacle that the dual sovereignty doctrine poses, but they press their claim by arguing that this case comes within an exception to the doctrine, an exception that itself derives from the Supreme Court's decision in Bartkus.
 
 
 43
 1. The Bartkus exception. In upholding a prosecution by the State of Illinois after a federal prosecution for the same offense, the Supreme Court in Bartkus indicated that the defendant could not reasonably claim that the state "was merely a tool of the federal authorities" or that "the state prosecution was a sham and a cover for a federal prosecution." Bartkus, 359 U.S. at 123-24, 79 S.Ct. at 678.[9] Relying upon this dicta, this Circuit and a number of others have defined what has been called the Bartkus exception to the dual sovereignty doctrine: "The Double Jeopardy Clause may be violated despite single prosecutions by separate sovereigns when one 'prosecuting sovereign can be said to be acting as a tool of the other.' " Whalers Cove, 954 F.2d at 38 (quoting United States v. Aboumoussallem, 726 F.2d 906, 910 (2d Cir.1984)); see also United States v. Davis, 906 F.2d 829, 832-34 (2d Cir.1990); United States v. Guy, 903 F.2d 1240, 1242 (9th Cir.1990) ("If the second prosecution, otherwise permissible under the dual sovereignty rule, ... is merely pursued as a sham on behalf of the sovereign first to prosecute, it may be subject to a successful double jeopardy challenge."). Accord In re Kunstler, 914 F.2d 505, 517 (4th Cir.1990), cert. denied, 499 U.S. 969, 111 S.Ct. 1607, 113 L.Ed.2d 669 (1991); United States v. Moore, 822 F.2d 35, 38 (8th Cir.1987); United States v. Aleman, 609 F.2d 298, 309 (7th Cir.1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); United States v. Liddy, 542 F.2d 76, 79-80 (D.C.Cir.1976).
 
 
 44
 GPS and Phil Schaffer assert that this case falls within the Bartkus exception to the dual sovereignty doctrine. In support of their claim, they point out that the Suffolk County District Attorney's Office referred this case to the U.S. Attorney in the first instance, that much of the evidence used in the federal forfeiture action was developed in connection with their state criminal proceedings, and that a Suffolk County district attorney was cross-designated as a Special Assistant U.S. Attorney for the purpose of prosecuting the federal forfeiture action against GPS and the Schaffers.
 
 
 45
 The District Court concluded that these facts did not present the sort of "extraordinary circumstances" that would bring this case within the Bartkus exception. See Memorandum and Order, United States v. All Assets of G.P.S. Automotive Corp., No. 91-0223, at 4-7 (E.D.N.Y. July 10, 1992). And were these the only pertinent facts at issue, it would be difficult to question the District Court's conclusion. In recognizing the Bartkus exception, our precedents, like those of other circuits, make clear that it applies only in an "extraordinary type of case," Davis, 906 F.2d at 832, perhaps only when one sovereign has essentially manipulated another sovereign into prosecuting. See Whalers Cove, 954 F.2d at 38 (suggesting that one sovereign "must have effectively manipulated the actions of the [other sovereign] so that [its] officials retained little or no independent volition."). Accord United States v. Baptista-Rodriguez, 17 F.3d 1354, 1361 (11th Cir.1994); Kunstler, 914 F.2d at 517; Liddy, 542 F.2d at 79.
 
 
 46
 Specifically, we have repeatedly held that even significant cooperation between state and federal authorities does not provide a basis for applying the Bartkus exception. See, e.g., Whalers Cove, 954 F.2d at 38; Davis, 906 F.2d at 832-34; United States v. Russotti, 717 F.2d 27, 31 (2d Cir.1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984); see also Moore, 822 F.2d at 38; Aleman, 609 F.2d at 309.[10] And every circuit to consider the issue has also held that the cross-designation of a state district attorney as a federal official to assist or even to conduct a federal prosecution does not by itself bring a case within the Bartkus exception to the dual sovereignty doctrine. See United States v. Figueroa-Soto, 938 F.2d 1015, 1019 (9th Cir.1991), cert. denied, 502 U.S. 1098, 112 S.Ct. 1181, 117 L.Ed.2d 424 (1992); United States v. Paiz, 905 F.2d 1014, 1024 (7th Cir.1990), cert. denied, 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991); United States v. Safari, 849 F.2d 891, 893 (4th Cir.), cert. denied, 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988); see also United States v. Perchitti, 955 F.2d 674, 677 (11th Cir.1992). But cf. United States v. Belcher, 762 F.Supp. 666 (W.D.Va.1991).[11]
 
 
 47
 Consequently, if this case involved no more than the cooperation between federal and state officials alleged here, we would surely be required to affirm the District Court's decision that this case does not fit into Bartkus 's "narrow exception to the dual sovereignty doctrine." Aboumoussallem, 726 F.2d at 910.[12] Prevailing precedents would leave little question that the Bartkus exception would not apply, for this case does not involve significantly more inter-sovereign cooperation than many past cases where the exception has been found inapplicable. See Daniel A. Braun, Praying to False Sovereigns: The Rule Permitting Successive Prosecutions in the Age of Cooperative Federalism, 20 Am.J.Crim.L. 1, 60 (1992) [hereafter Braun, False Sovereigns ] (discussing cases).
 
 
 48
 But there is an additional factor in this case, a factor unique to forfeiture cases and one not considered by the District Court. It is this wrinkle that leads us to conclude that, without further fact-finding, we cannot exclude the possibility that the Bartkus exception might apply. It was alleged in this case and further developed at oral argument that the state will ultimately receive a very large percentage of whatever forfeiture proceeds are derived from the federal action. If a state prosecutes to conviction and then prevails upon the federal prosecutor to deputize a state district attorney to bring a forfeiture, ostensibly in the name of the United States, but for the sole benefit of the state, the principles behind the Bartkus exception would be strongly implicated. In such a case, the federal government would have no interest in the forfeiture proceeding, and would be serving simply as a "tool" for the advancement of the state's interest. The Bartkus exception thus seems especially germane whenever the first prosecuting authority is to receive a disproportionate share of the proceeds of a subsequent forfeiture action to be brought by a different sovereign.
 
 
 49
 Unfortunately, the record in this case does not reveal what portion of the proceeds from the federal forfeiture action the state will receive. Significantly, in Whalers Cove, we held that the fact that a state police department might "receive a portion of the forfeiture proceeds" from a federal action following a state prosecution does not, in and of itself, trigger the Bartkus exception to the dual sovereignty doctrine. See 954 F.2d at 38. However, in Whalers Cove, it appeared clear that "the United States Government ... ha[d] its own interest in the proceeds" from the forfeiture. And there was no contention in Whalers Cove that the federal forfeiture action was initiated only at the behest of the state or that there was a lack of direct federal participation in its own forfeiture action. See id. Here, in contrast, there seems to be some possibility that the state may receive nearly all, or a disproportionate share, of the forfeiture proceeds. Moreover, GPS and Phil Schaffer have strongly argued that the federal forfeiture was essentially instigated by the state and that it was conducted almost exclusively by state officials from state offices.
 
 
 50
 Without more details concerning the financial arrangements and the division of labor and proceeds between the two sovereigns, we cannot at this stage reject the contention by GPS and Phil Schaffer that the federal government was merely acting as a "tool" for the state. Specifically, we do not think we can resolve the applicability of the Bartkus exception without additional fact-finding concerning the expected proceeds of the forfeiture, the extent, cost, and value of the labor and services provided by state officials in the federal action, and the bargain between federal and state authorities as to the split of the proceeds.
 
 
 51
 Once the District Court has found these facts, it should in their light, reconsider the other factors--e.g., who initiated the forfeiture action and what was the role of the deputized state prosecutor--that it properly held did not by themselves implicate the Bartkus exception. It must then conclude whether, taken all together, these factors amount to appropriate cooperation or to inappropriate use of one sovereign by another.
 
 
 52
 The District Court's decision necessarily involves a highly fact-intensive inquiry. For example, examination of the details surrounding the deal between federal and state officials in a case in which the state gets the bulk of the forfeiture proceeds may reveal no more than the federal government's willingness, in pursuing the forfeiture for its own purposes, to pay the state for its help. And deputizing a state prosecutor may, because of the state's knowledge of the case, be the most efficient way for the federal government to proceed. But the facts may show instead a lack of federal interest and a willingness to let the state effectuate its purposes and get the possible gains of the forfeiture so long as it is willing to bear the costs and risks of the forfeiture action. Cf. United States v. Bernhardt, 831 F.2d 181, 182-83 (9th Cir.1987) (remanding for further fact-finding to consider whether there was "sufficient independent federal involvement" in a federal criminal prosecution following a state action to "remove this case from the 'shams' and 'covers' that Bartkus reaches"). This kind of inquiry goes directly to the core of the Bartkus exception, given its concerns with whether one sovereign was used as another's "tool." See Bartkus, 359 U.S. at 123-24, 79 S.Ct. at 678-79.
 
 
 53
 2. Rethinking the Dual Sovereignty Doctrine. Though we remand for a consideration of whether this case is one of those rare cases in which the Bartkus exception might apply, this writer believes that the exception's narrowness combines with significant developments both in substantive federal criminal law and in criminal law enforcement to indicate that the entire dual sovereignty doctrine is in need of serious reconsideration. See United States v. Grimes, 641 F.2d 96, 101 (3d Cir.1981) (arguing that "a reexamination of [the dual sovereignty doctrine] may be in order"). Accordingly, I add a few words of my own about the dual sovereignty doctrine.[13]
 
 
 54
 Since its very first application in Lanza, the dual sovereignty doctrine has been strongly criticized. See, e.g., J.A.C. Grant, The Lanza Rule of Successive Prosecutions, 32 Colum.L.Rev. 1309 (1932). The attacks on the doctrine increased sharply after the Supreme Court's decisions in Bartkus and Abbate. See, e.g., Walter T. Fisher, Double Jeopardy, Two Sovereignties and the Intruding Constitution, 28 U.Chi.L.Rev. 591 (1961); Lawrence Newman, Double Jeopardy and the Problem of Successive Prosecution, 34 S.Cal.L.Rev. 252 (1961); George C. Pontikes, Dual Sovereignty and Double Jeopardy, 14 Case W.Res.L.Rev. 700 (1963). These criticisms, echoed and supplemented by more recent ones, have emphasized both the doctrine's weakness from an originalist point of view and its jurisprudential flaws. Thus, the doctrine has been called unfaithful to the Fifth Amendment's historical roots, see, e.g., Paul G. Cassell, The Rodney King Trials and the Double Jeopardy Clause: Some Observations on Original Meaning and the ACLU's Schizophrenic Views of the Dual Sovereign Doctrine, 41 UCLA L.Rev. 693, 709-15 (1994), and has been chided for relying on a notion of federalism that is inconsistent with other Supreme Court holdings, see, e.g., Evan Tsen Lee, The Dual Sovereignty Exception to Double Jeopardy: In the Wake of Garcia v. San Antonio Metropolitan Transit Authority, 22 New Eng.L.Rev. 31 (1987). Nevertheless, despite these and many other criticisms, the doctrine has perdured.
 
 
 55
 The continued vitality of the dual sovereignty doctrine is perhaps understandable from a historical perspective. Behind the fiction of calling a single act two distinct "offenses" because it violates the law of two sovereigns stand practical justifications for the doctrine. The danger that one sovereign may negate the ability of another adequately to punish a wrongdoer, by bringing a sham or poorly planned prosecution or by imposing a minimal sentence, is the most obvious. And this justification may explain the doctrine's emergence during prohibition when there was considerable fear of state attempts to nullify federal liquor laws,[14] as well as the doctrine's rebirth just at the time when state attempts to nullify federal desegregation laws and orders were at their height.[15]
 
 
 56
 There is little question, then, that a sovereign's ability to enforce its own laws as it wishes would be at least hindered if the actions of other sovereigns could limit its ability to bring prosecutions. See Heath, 474 U.S. at 93, 106 S.Ct. at 439-40; Abbate, 359 U.S. at 195, 79 S.Ct. at 670-71; Bartkus, 359 U.S. at 136-37, 79 S.Ct. at 685-86. See generally Note, Double Prosecution by State and Federal Governments: Another Exercise in Federalism, 80 Harv.L.Rev. 1538 (1967) (discussing sovereigns' interests protected by dual sovereignty doctrine). At the same time other possible solutions, like a requirement that one sovereign inform the other before it prosecutes a defendant whose alleged acts violated laws of both sovereigns, have seemed cumbersome and hard to apply. See Abbate, 359 U.S. at 195, 79 S.Ct. at 670-71 (contending that "it would be highly impractical for the federal authorities to attempt to keep informed of all state prosecutions which might bear on federal offenses").
 
 
 57
 Nevertheless, it is hard to justify limiting the reach of the Bill of Rights, adopted as it was to protect individual rights and liberties against governmental encroachment, on no stronger grounds than the relative cumbersomeness of plausible alternative measures that would protect the interests of the sovereigns involved. See generally Akhil Reed Amar & Jonathan L. Marcus, Double Jeopardy Law After Rodney King, 95 Colum.L.Rev. 1 (1995). As the Supreme Court stated in Halper when it held that the Double Jeopardy Clause could apply to purportedly civil sanctions, "[t]his constitutional protection is intrinsically personal." 490 U.S. at 447, 109 S.Ct. at 1901. With the Double Jeopardy Clause understood in these individualistic terms, it becomes difficult to accept generalized statements of sovereign interests as justifying the Clause's inapplicability to successive prosecutions by different governments.
 
 
 58
 More important than these theoretical considerations, however, are the dramatic changes that have occurred in the relationship between the federal government and the states since the time of Bartkus and Abbate, changes that have made what was then perhaps acceptable, or at least tolerable, far more dangerous today. When Bartkus and Abbate were decided in 1959, the scope of federal criminal law was still very narrow, and the overlap of federal and state criminal jurisdiction was quite small. The risk to individual rights posed by successive prosecutions by state and federal officials was therefore necessarily limited. Under such circumstances, it was not implausible to believe that these risks could be contained through prosecutorial rules, see Petite v. United States, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960) (discussing the policy, adopted by the Attorney General for the United States after Bartkus and Abbate, that limited federal prosecutions following state prosecutions), and by the development of a significant and dynamic "sham or cover" exception such as that which Bartkus, by negative implication, could be read to countenance.
 
 
 59
 In recent years, however, the scope of federal criminal law has expanded enormously. And the number of crimes for which a defendant may be made subject to both a state and a federal prosecution has become very large. See Braun, False Sovereigns, at 4. At the same time, the Bartkus exception has been defined extremely narrowly. It follows that today defendants in an enormous number of cases can be subjected to dual prosecutions. And this can happen even when state and federal officials, in practice, join together to take a second bite at the apple. As Judge Adams stated prophetically for the Third Circuit in United States v. Grimes, 641 F.2d 96 (3d Cir.1981), at a time when the growth of federal criminal law had not yet reached its present extremes, "the recent expansion of federal criminal ... jurisdiction magnifies the impact of Bartkus and Abbate, thus rendering a reassessment of those decisions timely from a practical standpoint as well," since "permitting successive state-federal prosecutions for the same act [appears] inconsistent with what is a most ancient principle in western jurisprudence--that the government may not twice place a person in jeopardy for the same offense." Id. at 100-01.
 
 
 60
 Among recent important examples of successive federal-state prosecution are (1) the federal prosecution of the Los Angeles police officers accused of using excessive force on motorist Rodney King after their acquittal on state charges, (2) the federal prosecution of an African-American youth accused of murdering a Hasidic Jew in the Crown Heights section of Brooklyn, New York, after his acquittal on state charges, and (3) the Florida state prosecution--seeking the death penalty--of the anti-abortion zealot who had been convicted and sentenced to life imprisonment in federal court for killing an abortion doctor. While I express no opinion whatsoever about these particular cases or about the applicability of the Double Jeopardy Clause to them, there can be no doubt that all of these cases involved re-prosecutions in emotionally and politically charged contexts. It was to avoid political pressures for re-prosecution that the Double Jeopardy Clause was adopted. See Bartkus, 359 U.S. at 150-64 & n. 34, 79 S.Ct. at 695-702 & n. 34 (Black, J., dissenting) (recounting the use of second prosecutions in totalitarian regimes following expressions of public outcry over initial dispositions). And it is especially troublesome that the dual sovereignty doctrine keeps the Double Jeopardy Clause from protecting defendants whose punishment, after an acquittal or an allegedly inadequate sentence, is the object of public attention and political concern.
 
 
 61
 The degree of cooperation between state and federal officials in criminal law enforcement has, moreover, reached unparalleled levels in the last few years, especially in the context of the "war on drugs." See, e.g., Sandra Guerra, The Myth of Dual Sovereignty: Multi-jurisdictional Drug Law Enforcement and Double Jeopardy, 73 N.C.L.Rev. 1159, 1180-91 (1995). This cooperation, which undoubtedly fosters effective enforcement of the criminal law, is surely to be encouraged. Still, this same cooperation should cause one to wonder whether it makes much sense to maintain the fiction that federal and state governments are so separate in their interests that the dual sovereignty doctrine is universally needed to protect one from the other.
 
 
 62
 The Supreme Court has recently shown its willingness to re-consider supposedly well-settled landmarks of double jeopardy jurisprudence with respect to its definition of what constitutes prosecutions for the "same offense." See United States v. Dixon, --- U.S. ----, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), and Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) (reviewing and reworking standards established more than a half-century before in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). And the Supreme Court's decision earlier this year in United States v. Lopez, --- U.S. ----, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), has similarly revealed the Court's willingness to give serious and renewed thought to issues of federalism at the foundation of our constitutional system, and to do so in the context of the enormous expansion of federal criminal law. In that light, a new look by the High Court at the dual sovereignty doctrine and what it means today for the safeguards the Framers sought to place in the Double Jeopardy Clause would surely be welcome.
 
 III. Excessive Fines
 
 63
 In Whalers Cove, in addition to addressing double jeopardy issues, this Court held that the proscriptions of the Eighth Amendment applied to an in rem civil forfeiture if it qualified "as punitive under Halper." 954 F.2d at 35.[16] We assumed, arguendo, that the particular forfeiture at issue before us in that case--the confiscation of a condominium in which the claimant had a $68,000 equity interest based on two drug sales on the premises--was "punishment," but found that the "punishment" did not, on the facts of that case, violate either the Cruel and Unusual Punishment Clause or the Excessive Fines Clause of the Eighth Amendment. See id. at 38. Relying on the standard set forth by the Supreme Court in Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), we found no violation of the Cruel and Unusual Punishment Clause because the forfeiture was not "a grossly disproportionate punishment." Whalers Cove, 954 F.2d at 39. And, after noting that the Supreme Court had "provided no guidance" in this area, we found no violation of the Excessive Fines Clause either, because the amount of the forfeiture was "not beyond the pale." Id.
 
 
 64
 Though other circuits had concluded that the Eighth Amendment was inapplicable to civil forfeitures, the Supreme Court in Austin v. United States, --- U.S. ----, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), vindicated our analysis in Whalers Cove by holding that the Eighth Amendment's Excessive Fines Clause applies to an in rem civil forfeiture proceeding brought under 21 U.S.C. Secs. 881(a)(4) and (a)(7) (for the confiscation of property linked to narcotics activity). The Supreme Court explained that for purposes of determining the Eighth Amendment's applicability in this context the question "is not ... whether forfeiture under Secs. 881(a)(4) and (a)(7) is civil or criminal, but rather whether it is punishment." Austin, --- U.S. at ----, 113 S.Ct. at 2806.[17]
 
 
 65
 While the Supreme Court in Austin conclusively resolved the general applicability of the Excessive Fines Clause to civil forfeitures, it expressly declined to set forth a test for determining when a particular forfeiture is constitutionally excessive or even to delineate a set of factors that should guide this decision. The Court explained: "Prudence dictates that we allow the lower courts to consider [these] question[s] in the first instance." Id. at ----, 113 S.Ct. at 2812.
 
 
 66
 In his concurring opinion, Justice Scalia contended that the only proper measure of the constitutional "extensiveness" of a fine was the relation between the forfeited property and the offense which served as its foundation: "The question is not how much the confiscated property is worth, but whether the confiscated property has a close enough relationship to the offense." Id. at ----, 113 S.Ct. at 2815 (Scalia, J., concurring). But the majority steadfastly refused to adopt that or any other specific approach: "We do not rule out the possibility that the connection between the property and the offense may be relevant, but our decision today in no way limits the Court of Appeals from considering other factors in determining whether the forfeiture of Austin's property was excessive." Austin, at ---- n. 15, 113 S.Ct. at 2812 n. 15.
 
 
 67
 Relying on Austin, all of the appellants in the case before us argued to the District Court that the forfeiture of their property violated the Excessive Fines Clause of the Eighth Amendment.[18] For reasons not fully apparent from the record, however, the District Court never addressed these claims. Since there was still to be a hearing to determine what portions of the defendant properties were to be retained by Grace Schaffer as an innocent owner, it may be that the District Court preferred to defer a decision on these Eighth Amendment issues until it delivered a final judgment, at which time it could determine precisely what property was subject to forfeiture. Be that as it may, since the District Court did not rule on appellants' contentions based on the Excessive Fines Clause, we do not have before us a fully developed factual record on these issues or, for that matter, a decision of the District Court to review.
 
 
 68
 The Government argues that we can affirm the orders of forfeiture despite the District Court's failure to consider the appellants' Eighth Amendment claim. Using a methodology that it argues we employed in Whalers Cove, the Government urges that the District Court's findings concerning the scope of the offenses committed by the claimants permit us to say that the forfeitures here ordered are not constitutionally excessive.[19]
 
 
 69
 Since this case was argued, however, we have had occasion, in United States v. Milbrand, 58 F.3d 841 (2d Cir.1995), to refine and augment significantly the generalized legal methodology first developed in Whalers Cove for determining when forfeitures are constitutionally excessive. Because the test elaborated in Milbrand turns on a number of factual matters that appear unresolved in the record before us, we believe that a remand of the appellants' claims based on the Excessive Fines Clause is essential.
 
 
 70
 In Milbrand, we reviewed the approaches developed by other courts for measuring whether a forfeiture is constitutionally excessive. We found that, following Austin 's unwillingness to establish an authoritative standard for the Excessive Fines Clause, a few courts have adopted the so-called "instrumentality" test advocated by Justice Scalia in his concurrence in Austin. (This approach, as noted before, focuses exclusively on the relationship between the property to be forfeited and the underlying offenses.) See United States v. Chandler, 36 F.3d 358, 362-65 (4th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1792, 131 L.Ed.2d 721 (1995); United States v. 427 & 429 Hall Street, 842 F.Supp. 1421, 1429-30 (M.D.Ala.1994). Most courts, however, have instead employed what has come to be called the "proportionality" test. (This approach considers a series of factors related to the severity of the offense and the value of property in order to determine whether the forfeiture constitutes a "disproportionate" punishment penalty.) See United States v. 9638 Chicago Heights, 27 F.3d 327, 330 (8th Cir.1994); United States v. RR # 1, Box 224, 14 F.3d 864, 872-76 (3d Cir.1994); United States v. 6625 Zumirez Drive, 845 F.Supp. 725, 731-38 (C.D.Cal.1994).
 
 
 71
 After considering these developments in other jurisdictions, we concluded in Milbrand, in view also of our earlier decision in Whalers Cove, "that appropriate excessiveness analysis entails a multi-factor test combining the principles of both instrumentality and proportionality." Milbrand, 58 F.3d at 847. Specifically, we explained that a court should consider
 
 
 72
 (1) the harshness of the forfeiture (e.g., the nature and value of the property and the effect of forfeiture on innocent third parties) in comparison to (a) the gravity of the offense, and (b) the sentence that could be imposed on the perpetrator of such an offense; (2) the relationship between the property and the offense, including whether use of the property in the offense was (a) important to the success of the illegal activity, (b) deliberate and planned or merely incidental and fortuitous, and (c) temporally or spatially extensive; and (3) the role and degree of culpability of the owner of the property.
 
 
 73
 Id. at 847-48.
 
 
 74
 This wise but intricate test, with its factors and sub-factors, obviously requires a fact-specific and fact-intensive inquiry to determine whether a particular civil forfeiture transgresses the Excessive Fines Clause. In their briefs on appeal, the parties in the instant case dispute any number of key details relating to the forfeitures--e.g., the value of the defendant properties, the scope and severity of the underlying criminal offenses, the role of the properties in these offenses, and the precise nature of the property owners' involvement.[20] And the District Court's findings, since they did not focus on the excessive fines issue, provide a very limited basis for resolving these disputes. Without specific findings, and on the under-developed factual record before us, we conclude that we are unable properly to apply the standard set forth in Milbrand to the forfeitures at issue and that we therefore must remand the case to the District Court.[21]
 
 CONCLUSION
 
 75
 We find first that the evidence that was adduced at trial is sufficient to uphold the civil forfeiture of GPS's assets and of the associated property owned by Skip and Phil Schaffer. Second, we hold that the District Court did not err in its finding that Skip Schaffer failed to make out an innocent owner defense. Third, since forfeiture actions raise unique issues with respect to the application of the Bartkus exception to the dual sovereignty doctrine, issues which the District Court did not consider, we cannot at this stage, without a more complete factual record, determine whether there was a double jeopardy violation in this case. And finally, since "fines must be closely scrutinized because they benefit the government," Whalers Cove, 954 F.2d at 39--and since the District Court has not yet "closely scrutinized" the forfeitures in this case and we are unable to do so on the record before us--we cannot decide whether the forfeitures here ordered are constitutionally valid under the Excessive Fines Clause. For these reason, we remand the case to the District Court for a resolution of the remaining factual disputes and for a consideration, in light of the Court's findings, of (1) whether the Bartkus exception to the dual sovereignty doctrine applies and, if it were to apply, whether the federal forfeitures against GPS and Phil Schaffer would violate the Double Jeopardy Clause of the Fifth Amendment, and (2) whether the forfeiture of the defendant properties constitutes a violation of the Excessive Fines Clause of the Eighth Amendment.
 
 
 
 [1]
 In pertinent part, 18 U.S.C. Sec. 1956(a)(1) prohibits
 a financial transaction which in fact involves the proceeds of specified unlawful activity ... with the intent to promote the carrying on of specified unlawful activity; or ... knowing that the transaction is designed in whole or in part to conceal or disguise ... the proceeds of specified unlawful activity.
 Among the offenses included in the definition of "specified unlawful activity" are violations of 18 U.S.C. Sec. 2321(a), which imposes criminal sanctions against anyone who
 buys, receives, possesses, or obtains control of, with intent to sell or otherwise dispose of, a motor vehicle or motor vehicle part, knowing that [its] identification number ... has been removed, obliterated, tampered with, or altered.
 
 
 [2]
 Perhaps the most prominent recent example of the difficulties the Clause has engendered is found in the Supreme Court's renewed attempts to define what is meant by the term "same offense." In United States v. Dixon, --- U.S. ----, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), the Supreme Court discarded an interpretation of "same offense" that it had espoused only three years earlier in Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990). In Dixon, the Supreme Court chose to re-adopt the approach to "same offense" that had prevailed before Grady, see --- U.S. at ----, 113 S.Ct. at 2859-61, even though the Court in Grady had specifically highlighted the "limitations" of this earlier approach, see 495 U.S. at 520, 110 S.Ct. at 2093; see also United States v. Liller, 999 F.2d 61, 62-63 (2d Cir.1993) (discussing the Supreme Court's change in approach)
 
 
 [3]
 The conclusion that Halper was concerned with how the sanction applied in each particular case is also supported by the Supreme Court's ultimate disposition in that case. In Halper the High Court remanded so that the trial court could re-assess whether the sanction imposed on the defendant in fact constituted "punishment" under the standard the Court had just set forth. See 490 U.S. at 452, 109 S.Ct. at 1903-04
 
 
 [4]
 In United States v. McCaslin, 959 F.2d 786 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 382, 121 L.Ed.2d 292 (1992), the Ninth Circuit had held--citing among other cases our decision in Whalers Cove--that "Halper has no application to the very ancient practice by which instrumentalities of a crime may be declared forfeit to the government." 959 F.2d at 788. However, in $405,089.23, the Ninth Circuit concluded that "in Austin, the Supreme Court said that we were wrong and directly rejected our McCaslin analysis." 33 F.3d at 1219
 
 
 [5]
 The significance of these issues is not easily overstated, particularly because in rem civil forfeitures have become favored weapons in the "war on drugs." If all such forfeitures are "punishment" under the Double Jeopardy Clause, then the Government will generally be precluded from seeking additional sanctions in criminal proceedings against those in the narcotics trade from whom the forfeiture of property has already been obtained. See Ursery, 59 F.3d at 571-76 (holding that the defendant's criminal narcotics conviction was barred by the Double Jeopardy Clause because he had previously been subject to a civil forfeiture judgment for the same offense); see also $405,089.23, 56 F.3d at 42-43 (Rymer, J., dissenting from the order rejecting the suggestion for rehearing en banc and detailing some of the consequences of the Ninth Circuit's holding)
 
 
 [6]
 Should the District Court conclude that the dual sovereignty doctrine does not apply, and perhaps before reaching the broader issues above, it ought also to consider whether the Double Jeopardy Clause might be inapplicable on the separate ground that the civil forfeiture action is not based on the "same offenses" as those upon which GPS and Phil Schaffer were convicted in state court. Cf. United States v. One 1978 Piper Cherokee Aircraft, 37 F.3d 489, 495 (9th Cir.1994) (remanding for consideration of whether a civil forfeiture order could be predicated "upon some offense other that those for which [the claimant] has already be tried"). Here, the federal offenses serving as a predicate for the forfeitures are not completely identical to the state offenses upon which GPS and Phil Schaffer were convicted. While we do not begin to consider these intricacies of the "same offense" doctrine or their impact on this case, we note that the Ninth Circuit has on this basis rejected claims that successive civil forfeiture actions/criminal prosecutions transgress the Double Jeopardy Clause. See, e.g., United States v. Chick, 61 F.3d 682, 684 (9th Cir.1995); United States v. $292,888.04, 54 F.3d 564, 568 (9th Cir.1995)
 
 
 [7]
 The doctrine was first mentioned by the Supreme Court in dicta in several pre-Civil War cases. See Fox v. Ohio, 46 U.S. (5 How.) 410, 424-35, 12 L.Ed. 213 (1847); Moore v. Illinois, 55 U.S. (14 How.) 13, 19-20, 14 L.Ed. 306 (1852)
 
 
 [8]
 Similar doctrines premised on distinctions between federal and state sovereignty that had developed in connection with the Fourth Amendment and the Self-Incrimination Clause of the Fifth Amendment were eliminated after these constitutional provisions were held applicable to the states. See Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). Though one might have expected the dual sovereignty doctrine similarly to have disappeared after the Double Jeopardy Clause of the Fifth Amendment was found applicable to the states in Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), the doctrine has survived and flourished. See United States v. Grimes, 641 F.2d 96, 100-02, 104 (3d Cir.1981) (noting that Benton served to "undercut" an important predicate of the Bartkus and Abbate opinions, but that the Supreme Court has still "continued to subscribe to the dual sovereignty doctrine"). See generally Akhil Reed Amar & Jonathan L. Marcus, Double Jeopardy Law After Rodney King, 95 Colum.L.Rev. 1, 11-18 (1995) (discussing the peculiar persistence of the doctrine)
 It is worth noting, however, that though the Supreme Court continues to utilize the dual sovereignty doctrine, see, e.g., Heath, 474 U.S. at 88-94, 106 S.Ct. at 437-40 (invoking the doctrine to uphold Alabama's imposition of the death penalty after Georgia accepted the defendant's guilty plea for the same murder), it has not had occasion to apply the dual sovereignty doctrine in the context of successive state-federal or federal-state prosecutions since the Double Jeopardy Clause of the Fifth Amendment was found applicable to the states.
 
 
 [9]
 Justice Brennan, writing for three Justices in dissent in Bartkus, argued that Bartkus's state prosecution after his federal acquittal should have been barred by the Double Jeopardy Clause because "the extent of participation of the federal authorities" in the subsequent state trial made it "in actuality a second federal prosecution--a second federal try at Bartkus in the guise of a state prosecution." Bartkus, 359 U.S. at 164-70, 79 S.Ct. at 702-05 (Brennan, J., dissenting). These three Justices thus clearly agreed with the suggestion by the Bartkus majority that, in certain instances, one sovereign's involvement in another sovereign's prosecution might make the dual sovereignty doctrine inapplicable, and believed that the facts surrounding Bartkus's successive prosecutions made his case just such an instance. See id
 
 
 [10]
 This reading of the Bartkus exception derives from the Bartkus case itself, since, as both the majority opinion and the dissent in Bartkus pointed out, there was significant cooperation between state and federal authorities in that case. See 359 U.S. at 123-24 & n. 1, 79 S.Ct. at 678-79 & n. 1; id. at 164-70, 79 S.Ct. at 702-05 (Brennan, J., dissenting)
 
 
 [11]
 In Belcher, the district court appears to have applied the exception based largely on the cooperation between state and federal officials, see 762 F.Supp. at 670-71, but it did so in the different context of collateral estoppel. The court held that the cross-designation of the state attorney who conducted an initial state trial amounted to a "breakdown in federalism" and hence made a subsequent federal prosecution "simply 'a sham and a cover' for the first." Id. The case was not appealed, however, and no other court that we know of has reached a similar holding
 
 
 [12]
 Some circuits have gone beyond defining the exception as "narrow" and have actually questioned whether there really is any such exception to the dual sovereignty doctrine. See United States v. Brocksmith, 991 F.2d 1363, 1366 (7th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 569, 126 L.Ed.2d 468 (1993); United States v. Patterson, 809 F.2d 244, 247 n. 2 (5th Cir.1987); see also Michael A. Dawson, Note, Popular Sovereignty, Double Jeopardy, and the Dual Sovereignty Doctrine, 102 Yale L.J. 281, 296 (1992). As noted in text, however, this circuit has consistently affirmed the existence of the Bartkus exception
 
 
 [13]
 Judges Altimari and Leval do not join this portion of the opinion. Accordingly, this subsection II.B.2 is not a part of the opinion of the Court, but rather is in the nature of a separate concurrence. The practice of writing a separate concurrence to one's own opinion for the court, though unusual, is not novel. Indeed, Justice Brennan used the same device in Abbate (the companion case to Bartkus ) to add further comments concerning his views on the dual sovereignty doctrine. See Abbate, 359 U.S. at 187-96, 79 S.Ct. at 666-71 (opinion of the Court delivered by Justice Brennan); id. at 196-201, 79 S.Ct. at 671-74 (separate opinion of Justice Brennan). See also Oliveira v. Mayer, 23 F.3d 642, 649 n. 2 (2d Cir.1994) (expressing distinct views of "the writer," Newman, C.J., in an opinion for this Court), cert. denied, --- U.S. ----, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995)
 
 
 [14]
 The Supreme Court in Lanza crowned its opinion by stressing its concerns about allowing a state to "punish the manufacture, transportation and sale of intoxicating liquor by small or nominal fines," and thereby prompt a "race of offenders to the courts of that State to plead guilty and secure immunity from federal prosecution." Lanza, 260 U.S. at 385, 43 S.Ct. at 143. See generally Kenneth M. Murchison, The Dual Sovereignty Exception to Double Jeopardy, 14 N.Y.U.Rev.L. & Soc.Change 383, 384 (1986) (detailing the dual sovereignty doctrine's "origin in the era of national prohibition")
 
 
 [15]
 Bartkus and Abbate were before the Supreme Court in the same term that it was required to rebuke "a claim by the Governor and Legislature of a State that there is no duty on state officials to obey federal court orders ... [based] on the premise that they are not bound by [the] holding in Brown v. Board of Education." Cooper v. Aaron, 358 U.S. 1, 4, 78 S.Ct. 1401, 1402-03, 3 L.Ed.2d 5 (1958). And, quite noticeably, the Court went out of its way in both Bartkus and Abbate to mention Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)--a federal criminal civil rights prosecution of a Georgia state sheriff who had beaten a black man to death--when it discussed the importance of the dual sovereignty doctrine in insuring that separate sovereigns are able to vindicate their own interests in particular criminal conduct. See Bartkus, 359 U.S. at 137, 79 S.Ct. at 685; Abbate, 359 U.S. at 195, 79 S.Ct. at 670-71
 
 
 [16]
 The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII
 
 
 [17]
 In this respect, the Court endorsed our analysis in Whalers Cove. But in contrast to our approach in Whalers Cove, the Austin Court, in deciding whether a forfeiture under 21 U.S.C. Secs. 881(a)(4) and (a)(7) constituted "punishment" for purposes of the Excessive Fines Clause, focused upon the statute, under which the Government sought forfeiture, "as a whole." Id. at ---- - ---- & n. 14, 113 S.Ct. at 2810-12 & n. 14 (emphasis added). As mentioned before, in Whalers Cove we had looked to the particular facts in the case to decide whether a forfeiture was punishment or not
 
 
 [18]
 The appellants make no claim that the forfeitures in this case violate the Cruel and Unusual Punishment Clause. We therefore have no occasion to review, in light of the Supreme Court's decision in Austin, our holding in Whalers Cove that the Punishments Clause is applicable in this context and places its own limits on in rem civil forfeitures. Cf. United States v. 835 Seventh Street, 832 F.Supp. 43, 48 (N.D.N.Y.1993) (concluding that the Supreme Court's decision in Austin did not provide a ground for reconsideration of a prior holding, based on Whalers Cove, that a forfeiture violated the Cruel and Unusual Punishment Clause)
 
 
 [19]
 Though Austin was concerned with forfeiture under 21 U.S.C. Secs. 881(a)(4) and (a)(7), the Government makes no claim that the forfeitures in this case, which were pursuant to 18 U.S.C. Sec. 981(a)(1), are not also subject to the limitations of the Excessive Fines Clause. Since Austin, courts have consistently held that forfeitures under Sec. 981(a)(1), like forfeitures pursuant to 21 U.S.C. Secs. 881(a)(4) and (a)(7), implicate the Excessive Fines Clause. See, e.g., United States v. Taylor, 13 F.3d 786, 789-90 (4th Cir.1994); United States v. 6625 Zumirez Drive, 845 F.Supp. 725, 739-40 (C.D.Cal.1994); see also United States v. $21,282, 47 F.3d 972, 973 (8th Cir.1995)
 
 
 [20]
 Importantly, though we find no error in the District Court's conclusion that Skip Schaffer failed to establish an "innocent owner" defense, see supra Part I.B., because the test we spelled out in Milbrand looks in part to "the role and degree of culpability of the owner of the property," 58 F.3d at 848, the District Court upon remand will need to examine carefully the extent of Skip's knowledge of, and involvement in, the underlying criminal activity in order to assess his claim based on the Excessive Fines Clause. See id. (noting, in conducting an excessive fines analysis after having already rejected an "innocent owner" defense, that the claimant "had a significant degree of culpability in the criminal use of the property")
 
 
 [21]
 At the very conclusion of its brief on appeal, the Government notes that the Supreme Court has not resolved whether corporations are covered by the Excessive Fines Clause of the Eighth Amendment. See Browning-Ferris Industries of Vermont v. Kelco Disposal, Inc., 492 U.S. 257, 276 n. 22, 109 S.Ct. 2909, 2920 n. 22, 106 L.Ed.2d 219 (1989) (expressly refusing to "decide whether the Eighth Amendment protects corporations as well as individuals"). If the Government chooses to contest GPS's claim on this basis, the District Court will have to consider this issue as well