PD-0358_0363-16
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/9/2016 3:26:19 PM
Accepted 6/10/2016 10:57:11 AM
ABEL ACOSTA
CLERK

PD NO. 0358-16
PD NO. 0359-16
PD NO. 0360-16
PD NO. 0361-16
PD NO. 0362-16
PD NO. 0363-16

IN THE COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS

FILED IN
COURT OF CRIMINAL APPEALS

June 10, 2016

ABEL ACOSTA, CLERK

CALVIN WALKER, Petitioner

VS.

THE STATE OF TEXAS, Respondent

---

**SUPPLEMENT TO WALKER'S
PETITION FOR DISCRETIONARY REVIEW**

---

TO THE HONORABLE JUSTICES OF SAID COURT:

The Supreme Court of the United States recently decided an important case involving double jeopardy and the dual-sovereignty doctrine. *See Puerto Rico v. Sanchez Valle,* No. 15-108, 597 U.S. ___ (June 9, 2016), attached as Appendix A. In that case, the Court decided that Puerto Rico derives its prosecutorial power from the federal government, and therefore, it is not a separate sovereign for double jeopardy purposes. *See id.* Justice Kagan delivered the Court's opinion, in which Chief Justice Roberts and Justices Kennedy, Ginsburg, and Alito joined. Justice Ginsburg also authored a separate, concurring opinion in which Justice Thomas joined. Justice Ginsburg's concurrence significantly impacts the analysis of whether Walker presented a viable claim for relief in his pretrial habeas applications.

In the district court, Walker contended that the six state indictments filed against him were barred from prosecution because he had resolved the very same alleged criminal conduct in a

previous federal plea agreement. The district court denied the relief sought by the habeas applications, and Walker appealed. Both the district court and the court of appeals expressed doubt as to whether the so-called *Bartkus* exception to the dual-sovereignty doctrine was an exception at all. *See Ex parte Walker*, __ S.W.3d __, 2016 WL 908374 at *6-9 (Tex. App.—Beaumont March 9, 2016); District Court Order at 2-3. Justice Ginsburg's concurrence reveals that at least two Justices of the Supreme Court believe that such an exception does exist. Even more relevant here, the concurrence also makes it clear that at least two Justices believe that a person should not be subject to multiple punishments for the same criminal conduct by separate sovereigns, without regard to the inter-relatedness of the two sovereigns. Justice Ginsburg wrote:

> I join in full the Court's opinion, which cogently applies long prevailing doctrine. I write only to flag a larger question that bears fresh examination in an appropriate case. The double jeopardy proscription is intended to shield individuals from the harassment of multiple prosecutions for the same misconduct. *Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). Current "separate sovereigns" doctrine hardly serves that objective. States and Nation are "kindred systems," yet "parts of ONE WHOLE." The Federalist No. 82, p. 245 (J. Hopkins ed., 2d ed. 1802) (reprint 2008). Within that whole is it not "an affront to human dignity," *Abbate v. United States,* 359 U.S. 187, 203, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (Black, J., dissenting), "inconsistent with the spirit of [our] Bill of Rights," Developments in the Law—Criminal Conspiracy, 72 Harv. L.Rev. 920, 968 (1959), to try or punish a person twice for the same offense? Several jurists and commentators have suggested that the question should be answered with a resounding yes: ***Ordinarily, a final judgment in a criminal case, just as a final judgment in a civil case, should preclude renewal of the fray anyplace in the Nation.*** See *Bartkus v. Illinois,* 359 U.S. 121, 150, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (Black, J., dissenting); *United States v. All Assets of G.P.S. Automotive Corp.,* 66 F.3d 483 (C.A.2 1995) (Calabresi, J.); Franck, An International Lawyer Looks at the *Bartkus* Rule, 34 N.Y.U.L.Rev. 1096 (1959); Grant, Successive Prosecutions by State and Nation: Common Law and British Empire Comparisons, 4 UCLA L.Rev. 1 (1956); Grant, The *Lanza* Rule of Successive Prosecutions, 32 Colum. L.Rev. 1309 (1932). See also 6 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 25.5(a), p. 851 (4th ed. 2015) ("Criticism of *Abbate* ['s separate sovereign exception] intensified after the Supreme Court held that the Double Jeopardy Clause of the Fifth Amendment was also applicable to the states...." (citing, *inter alia,* Braun, Praying to False Sovereigns: The Rule Permitting Successive Prosecutions in the Age of Cooperative Federalism, 20 Am.

J.Crim. L. 1 (1992))).  The matter warrants attention in a future case in which a defendant faces successive prosecutions by parts of the whole USA.

*Sanchez Valle*, No. 15-108, 579 U.S. __ (Ginsburg, J., concurring).

The key takeaway from *Sanchez Valle* with respect to Walker's claims is that one of the most liberal and one of the conservative Justices on our country's highest court agree that a federal prosecution should bar a state prosecution for the same conduct.  The degree of cooperation between those sovereigns is not the issue.  The issue is whether the same conduct is prosecuted.

The recent decision in *Sanchez Valle* merits remand to the district court for proper consideration of Walker's habeas applications.

<div style="margin-left:50%">

Respectfully submitted,

DEGUERIN, DICKSON, HENNESSY & WARD

*/s/Dick DeGuerin*
Dick DeGuerin
State Bar No. 05638000
Matt Hennessy
State Bar No.  00787677
1018 Preston, 7th Floor
Houston, Texas  77002
(713) 223-5959 Telephone
(713) 223-9231 Facsimile

*Attorneys for Petitioner*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Supplement to Walker's Petition for Discretionary Review, has been delivered to the following parties via electronic filing on June 8, 2016:

Wayln G. Thompson
Assistant District Attorney
1085 Pearl St.
Beaumont, Texas  77701

Lisa McMinn
State Prosecuting Attorney
P O Box 13406
Austin, Texas  78711

*/s/Dick DeGuerin*
Dick DeGuerin

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## COMMONWEALTH OF PUERTO RICO *v.* SANCHEZ VALLE ET AL.

### CERTIORARI TO THE SUPREME COURT OF PUERTO RICO

No. 15–108.   Argued January 13, 2016—Decided June 9, 2016

Respondents Luis Sánchez Valle and Jaime Gómez Vázquez each sold a gun to an undercover police officer.  Puerto Rican prosecutors indicted them for illegally selling firearms in violation of the Puerto Rico Arms Act of 2000.  While those charges were pending, federal grand juries also indicted them, based on the same transactions, for violations of analogous U. S. gun trafficking statutes.  Both defendants pleaded guilty to the federal charges and moved to dismiss the pending Commonwealth charges on double jeopardy grounds.  The trial court in each case dismissed the charges, rejecting prosecutors' arguments that Puerto Rico and the United States are separate sovereigns for double jeopardy purposes and so could bring successive prosecutions against each defendant.  The Puerto Rico Court of Appeals consolidated the cases and reversed.  The Supreme Court of Puerto Rico granted review and held, in line with the trial court, that Puerto Rico's gun sale prosecutions violated the Double Jeopardy Clause.

*Held*: The Double Jeopardy Clause bars Puerto Rico and the United States from successively prosecuting a single person for the same conduct under equivalent criminal laws. Pp. 5–18.

   (a) Ordinarily, a person cannot be prosecuted twice for the same offense.  But under the dual-sovereignty doctrine, the Double Jeopardy Clause does not bar successive prosecutions if they are brought by separate sovereigns.  See, *e.g.*, *United States* v. *Lanza*, 260 U. S. 377, 382.  Yet "sovereignty" in this context does not bear its ordinary meaning.  This Court does not examine the extent of control that one prosecuting entity wields over the other, the degree to which an entity exercises self-governance, or a government's more particular ability to enact and enforce its own criminal laws.  Rather, the test hinges

on a single criterion: the "ultimate source" of the power undergird-
ing the respective prosecutions. *United States* v. *Wheeler*, 435 U. S.
313, 320. If two entities derive their power to punish from independ-
ent sources, then they may bring successive prosecutions. Converse-
ly, if those entities draw their power from the same ultimate source,
then they may not.

Under that approach, the States are separate sovereigns from the
Federal Government and from one another. Because States rely on
"authority originally belonging to them before admission to the Union
and preserved to them by the Tenth Amendment," state prosecutions
have their roots in an "inherent sovereignty" unconnected to the U. S.
Congress. *Heath* v. *Alabama*, 474 U. S. 82, 89. For similar reasons,
Indian tribes also count as separate sovereigns. A tribe's power to
punish pre-existed the Union, and so a tribal prosecution, like a
State's, is "attributable in no way to any delegation . . . of federal au-
thority." *Wheeler,* 435 U. S., at 328. Conversely, a municipality can-
not count as a sovereign distinct from a State, because it receives its
power, in the first instance, from the State. See, *e.g.*, *Waller* v. *Flori-
da*, 397 U. S. 387, 395. And most pertinent here, this Court conclud-
ed in the early 20th century that U. S. territories—including an ear-
lier incarnation of Puerto Rico itself—are not sovereigns distinct from
the United States. *Grafton* v. *United States*, 206 U. S. 333. The
Court reasoned that "the territorial and federal laws [were] creations
emanating from the same sovereignty," *Puerto Rico* v. *Shell Co. (P.
R.), Ltd.*, 302 U. S. 253, 264, and so federal and territorial prosecu-
tors do not derive their powers from independent sources of authori-
ty. Pp. 5–11.

(b) The *Grafton* and *Shell Co.* decisions, in and of themselves, do
not control here. In the mid-20th century, Puerto Rico became a new
kind of political entity, still closely associated with the United States
but governed in accordance with, and exercising self-rule through, a
popularly-ratified constitution. The magnitude of that change re-
quires consideration of the dual-sovereignty question anew. Yet the
result reached, given the historical test applied, ends up the same.
Going back as far as the doctrine demands—to the "ultimate source"
of Puerto Rico's prosecutorial power—reveals, once again, the U. S.
Congress. *Wheeler*, 435 U. S., at 320. Pp. 12–18.

(1) In 1950, Congress enacted Public Law 600, which authorized
the people of Puerto Rico to organize a government pursuant to a
constitution of their own adoption. The Puerto Rican people capital-
ized on that opportunity, calling a constitutional convention and
overwhelmingly approving the charter it drafted. Once Congress ap-
proved that proposal—subject to several important conditions accept-
ed by the convention—the Commonwealth of Puerto Rico, a new po-

litical entity, came into being.

Those constitutional developments were of great significance—and, indeed, made Puerto Rico "sovereign" in one commonly understood sense of that term. At that point, Congress granted Puerto Rico a degree of autonomy comparable to that possessed by the States. If the dual-sovereignty doctrine hinged on measuring an entity's self-governance, the emergence of the Commonwealth would have resulted as well in the capacity to bring the kind of successive prosecutions attempted here. Pp. 13–14.

(2) But the dual-sovereignty test focuses not on the fact of self-rule, but on where it first came from. And in identifying a prosecuting entity's wellspring of authority, the Court has insisted on going all the way back—beyond the immediate, or even an intermediate, locus of power to what is termed the "ultimate source." On this settled approach, Puerto Rico cannot benefit from the dual-sovereignty doctrine. True enough, that the Commonwealth's power to enact and enforce criminal law now proceeds, just as petitioner says, from the Puerto Rico Constitution as "ordain[ed] and establish[ed]" by "the people." P. R. Const., Preamble. But back of the Puerto Rican people and their Constitution, the "ultimate" source of prosecutorial power remains the U. S. Congress. Congress, in Public Law 600, authorized Puerto Rico's constitution-making process in the first instance, and Congress, in later legislation, both amended the draft charter and gave it the indispensable stamp of approval. Put simply, Congress conferred the authority to create the Puerto Rico Constitution, which in turn confers the authority to bring criminal charges. That makes Congress the original source of power for Puerto Rico's prosecutors—as it is for the Federal Government's. The island's Constitution, significant though it is, does not break the chain. Pp. 14–18.

Affirmed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, and ALITO, JJ., joined. GINSBURG, J., filed a concurring opinion, in which THOMAS, J., joined. THOMAS, J., filed an opinion concurring in part and concurring in the judgment. BREYER, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 15–108

———————

## COMMONWEALTH OF PUERTO RICO, PETITIONER *v.* LUIS M. SANCHEZ VALLE, ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF PUERTO RICO

[June 9, 2016]

JUSTICE KAGAN delivered the opinion of the Court.

The Double Jeopardy Clause of the Fifth Amendment prohibits more than one prosecution for the "same offence." But under what is known as the dual-sovereignty doctrine, a single act gives rise to distinct offenses—and thus may subject a person to successive prosecutions—if it violates the laws of separate sovereigns. To determine whether two prosecuting authorities are different sovereigns for double jeopardy purposes, this Court asks a narrow, historically focused question. The inquiry does not turn, as the term "sovereignty" sometimes suggests, on the degree to which the second entity is autonomous from the first or sets its own political course. Rather, the issue is only whether the prosecutorial powers of the two jurisdictions have independent origins—or, said conversely, whether those powers derive from the same "ultimate source." *United States* v. *Wheeler*, 435 U. S. 313, 320 (1978).

In this case, we must decide if, under that test, Puerto Rico and the United States may successively prosecute a single defendant for the same criminal conduct. We hold

they may not, because the oldest roots of Puerto Rico's
power to prosecute lie in federal soil.

## I

## A

Puerto Rico became a territory of the United States in
1898, as a result of the Spanish-American War. The
treaty concluding that conflict ceded the island, then a
Spanish colony, to the United States, and tasked Congress
with determining "[t]he civil rights and political status" of
its inhabitants. Treaty of Paris, Art. 9, Dec. 10, 1898, 30
Stat. 1759. In the ensuing hundred-plus years, the United
States and Puerto Rico have forged a unique political
relationship, built on the island's evolution into a constitu-
tional democracy exercising local self-rule.

Acting pursuant to the U. S. Constitution's Territory
Clause, Congress initially established a "civil government"
for Puerto Rico possessing significant authority over in-
ternal affairs. Organic Act of 1900, ch. 191, 31 Stat. 77;
see U. S. Const., Art. IV, §3, cl. 2 (granting Congress the
"Power to dispose of and make all needful Rules and Regu-
lations respecting the Territory or other Property belong-
ing to the United States"). The U. S. President, with the
advice and consent of the Senate, appointed the governor,
supreme court, and upper house of the legislature; the
Puerto Rican people elected the lower house themselves.
See §§17–35, 31 Stat. 81–85. Federal statutes generally
applied (as they still do) in Puerto Rico, but the newly
constituted legislature could enact local laws in much the
same way as the then-45 States. See §§14–15, 32, *id.*, at
80, 83–84; *Puerto Rico* v. *Shell Co. (P. R.), Ltd.*, 302 U. S.
253, 261 (1937).

Over time, Congress granted Puerto Rico additional
autonomy. A federal statute passed in 1917, in addition to
giving the island's inhabitants U. S. citizenship, replaced
the upper house of the legislature with a popularly elected

senate. See Organic Act of Puerto Rico, ch. 145, §§5, 26, 39 Stat. 953, 958. And in 1947, an amendment to that law empowered the Puerto Rican people to elect their own governor, a right never before accorded in a U. S. territory. See Act of Aug. 5, 1947, ch. 490, §1, 61 Stat. 770.

Three years later, Congress enabled Puerto Rico to embark on the project of constitutional self-governance. Public Law 600, "recognizing the principle of government by consent," authorized the island's people to "organize a government pursuant to a constitution of their own adoption." Act of July 3, 1950, §1, 64 Stat. 319. Describing itself as "in the nature of a compact," the statute submitted its own terms to an up-or-down referendum of Puerto Rico's voters. *Ibid.* According to those terms, the eventual constitution had to "provide a republican form of government" and "include a bill of rights"; all else would be hashed out in a constitutional convention. §2, 64 Stat. 319. The people of Puerto Rico would be the first to decide, in still another referendum, whether to adopt that convention's proposed charter. See §3, 64 Stat. 319. But Congress would cast the dispositive vote: The constitution, Public Law 600 declared, would become effective only "[u]pon approval by the Congress." *Ibid.*

Thus began two years of constitution-making for the island. The Puerto Rican people first voted to accept Public Law 600, thereby triggering a constitutional convention. And once that body completed its work, the island's voters ratified the draft constitution. Congress then took its turn on the document: Before giving its approval, Congress removed a provision recognizing various social welfare rights (including entitlements to food, housing, medical care, and employment); added a sentence prohibiting certain constitutional amendments, including any that would restore the welfare-rights section; and inserted language guaranteeing children's freedom to attend private schools. See Act of July 3, 1952, 66 Stat.

327; Draft Constitution of the Commonwealth of Puerto Rico (1952), in Documents on the Constitutional Relationship of Puerto Rico and the United States 199 (M. Ramirez Lavandero ed., 3d ed. 1988). Finally, the constitution became law, in the manner Congress had specified, when the convention formally accepted those conditions and the governor "issue[d] a proclamation to that effect." Ch. 567, 66 Stat. 328.

The Puerto Rico Constitution created a new political entity, the Commonwealth of Puerto Rico—or, in Spanish, Estado Libre Asociado de Puerto Rico. See P. R. Const., Art. I, §1. Like the U. S. Constitution, it divides political power into three branches—the "legislative, judicial and executive." Art. I, §2. And again resonant of American founding principles, the Puerto Rico Constitution describes that tripartite government as "republican in form" and "subordinate to the sovereignty of the people of Puerto Rico." *Ibid.* The Commonwealth's power, the Constitution proclaims, "emanates from the people and shall be exercised in accordance with their will, within the terms of the compact agreed upon between the people of Puerto Rico and the United States." Art. I, §1.

B

We now leave the lofty sphere of constitutionalism for the grittier precincts of criminal law. Respondents Luis Sánchez Valle and Jaime Gómez Vázquez (on separate occasions) each sold a gun to an undercover police officer. Commonwealth prosecutors indicted them for, among other things, selling a firearm without a permit in violation of the Puerto Rico Arms Act of 2000. See 25 Laws P. R. Ann. §458 (2008). While those charges were pending, federal grand juries indicted Sánchez Valle and Gómez Vázquez, based on the same transactions, for violations of analogous U. S. gun trafficking statutes. See 18 U. S. C. §§922(a)(1)(A), 923(a), 924(a)(1)(D), 924(a)(2).

Both defendants pleaded guilty to those federal charges.

Following their pleas, Sánchez Valle and Gómez Vázquez moved to dismiss the pending Commonwealth charges on double jeopardy grounds. The prosecutors in both cases opposed those motions, arguing that Puerto Rico and the United States are different sovereigns for double jeopardy purposes, and so could bring successive prosecutions against each of the two defendants. The trial courts rejected that view and dismissed the charges. See App. to Pet. for Cert. 307a–352a. But the Puerto Rico Court of Appeals, after consolidating the two cases, reversed those decisions. See *id.,* at 243a–306a.

The Supreme Court of Puerto Rico granted review and held that Puerto Rico's gun sale prosecutions violated the Double Jeopardy Clause. See *id.,* at 1a–70a. The majority reasoned that, under this Court's dual-sovereignty doctrine, "what is crucial" is "[t]he ultimate source" of Puerto Rico's power to prosecute. *Id.,* at 19a; see *id.,* at 20a ("The use of the word 'sovereignty' in other contexts and for other purposes is irrelevant"). Because that power originally "derived from the United States Congress"—*i.e.,* the same source on which federal prosecutors rely—the Commonwealth could not retry Sánchez Valle and Gómez Vázquez for unlawfully selling firearms. *Id.,* at 66a. Three justices disagreed, believing that the Commonwealth and the United States are separate sovereigns. See *id.,* at 71a–242a.

We granted certiorari, 576 U. S. \_\_\_ (2015), to determine whether the Double Jeopardy Clause bars the Federal Government and Puerto Rico from successively prosecuting a defendant on like charges for the same conduct. We hold that it does, and so affirm.

## II
### A

This case involves the dual-sovereignty carve-out from

the Double Jeopardy Clause. The ordinary rule under that Clause is that a person cannot be prosecuted twice for the same offense. See U. S. Const., Amdt. 5 ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb").[1] But two prosecutions, this Court has long held, are not for the same offense if brought by different sovereigns—even when those actions target the identical criminal conduct through equivalent criminal laws. See, *e.g., United States* v. *Lanza*, 260 U. S. 377, 382 (1922). As we have put the point: "[W]hen the same act transgresses the laws of two sovereigns, it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences." *Heath* v. *Alabama*, 474 U. S. 82, 88 (1985) (internal quotation marks omitted). The Double Jeopardy Clause thus drops out of the picture when the "entities that seek successively to prosecute a defendant for the same course of conduct [are] separate sovereigns." *Ibid.*

Truth be told, however, "sovereignty" in this context does not bear its ordinary meaning. For whatever reason, the test we have devised to decide whether two governments are distinct for double jeopardy purposes overtly disregards common indicia of sovereignty. Under that standard, we do not examine the "extent of control" that "one prosecuting authority [wields] over the other." *Wheeler*, 435 U. S., at 320. The degree to which an entity exercises self-governance—whether autonomously managing its own affairs or continually submitting to outside direction—plays no role in the analysis. See *Shell Co.*, 302 U. S., at 261–262, 264–266. Nor do we care about a gov-

—————

[1] Because the parties in this case agree that the Double Jeopardy Clause applies to Puerto Rico, we have no occasion to consider that question here. See Brief for Petitioner 19–21; Brief for Respondents 20, n. 4; see also Brief for United States as *Amicus Curiae* 10, n. 1 (concurring).

ernment's more particular ability to enact and enforce its own criminal laws. See *Waller* v. *Florida*, 397 U. S. 387, 391–395 (1970). In short, the inquiry (despite its label) does not probe whether a government possesses the usual attributes, or acts in the common manner, of a sovereign entity.[2]

Rather, as Puerto Rico itself acknowledges, our test hinges on a single criterion: the "ultimate source" of the power undergirding the respective prosecutions. *Wheeler*, 435 U. S., at 320; see Brief for Petitioner 26. Whether two prosecuting entities are dual sovereigns in the double jeopardy context, we have stated, depends on "whether [they] draw their authority to punish the offender from distinct sources of power." *Heath*, 474 U. S., at 88. The inquiry is thus historical, not functional—looking at the deepest wellsprings, not the current exercise, of prosecutorial authority. If two entities derive their power to punish from wholly independent sources (imagine here a pair of parallel lines), then they may bring successive prosecutions. Conversely, if those entities draw their power from the same ultimate source (imagine now two lines emerging from a common point, even if later diverging), then they

---

[2] The dissent, ignoring our longstanding precedent to the contrary, see *supra,* at 6–7; *infra*, at 7–11, advances an approach of just this stripe: Its seven considerations all go to the question whether the Commonwealth, by virtue of Public Law 600, gained "the sovereign authority to enact and enforce" its own criminal laws. *Post,* at 5 (opinion of BREYER, J.). Our disagreement with the dissent arises entirely from its use of this test. If the question is whether, after the events of 1950–1952, Puerto Rico had authority to enact and enforce its own criminal laws (or, slightly differently phrased, whether Congress then decided that it should have such autonomy), the answer (all can and do agree) is yes. See *infra*, at 13–17. But as we now show, that is not the inquiry our double jeopardy law has made relevant: To the contrary, we have rejected that approach again and again—and so reached results inconsistent with its use. See, *e.g., Heath* v. *Alabama*, 474 U. S. 82, 88–91 (1985); *Waller* v. *Florida*, 397 U. S. 387, 391–395 (1970); see *infra*, at 7–11.

may not.[3]

Under that approach, the States are separate sovereigns from the Federal Government (and from one another). See *Abbate* v. *United States*, 359 U. S. 187, 195 (1959); *Bartkus* v. *Illinois*, 359 U. S. 121, 132–137 (1959); *Heath*, 474 U. S., at 88. The States' "powers to undertake criminal prosecutions," we have explained, do not "derive[] . . . from the Federal Government." *Id.,* at 89. Instead, the States rely on "authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment." *Ibid.*; see U. S. Const., Amdt. 10 ("The powers not delegated to the United States by the Constitution . . . are reserved to the States"); *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 779 (1991) (noting that the States "entered the [Union] with their sovereignty intact"). Said otherwise: Prior to forming the Union, the States possessed "separate and independent sources of power and authority," which they continue to draw upon in enacting and enforcing criminal laws. *Heath*, 474 U. S., at 89. State prosecutions therefore have their most ancient roots in an "inherent sovereignty" unconnected to, and indeed pre-existing, the U. S. Congress. *Ibid.*[4]

————————

[3] The Court has never explained its reasons for adopting this historical approach to the dual-sovereignty doctrine. It may appear counterintuitive, even legalistic, as compared to an inquiry focused on a governmental entity's functional autonomy. But that alternative would raise serious problems of application. It would require deciding exactly how much autonomy is sufficient for separate sovereignty and whether a given entity's exercise of self-rule exceeds that level. The results, we suspect, would often be uncertain, introducing error and inconsistency into our double jeopardy law. By contrast, as we go on to show, the Court has easily applied the "ultimate source" test to classify broad classes of governments as either sovereign or not for purposes of barring retrials. See *infra*, at 8–11.

[4] Literalists might object that only the original 13 States can claim such an independent source of authority; for the other 37, Congress played some role in establishing them as territories, authorizing or approving their constitutions, or (at the least) admitting them to the

For similar reasons, Indian tribes also count as separate sovereigns under the Double Jeopardy Clause. Originally, this Court has noted, "the tribes were self-governing sovereign political communities," possessing (among other capacities) the "inherent power to prescribe laws for their members and to punish infractions of those laws." *Wheeler*, 435 U. S., at 322–323. After the formation of the United States, the tribes became "domestic dependent nations," subject to plenary control by Congress—so hardly "sovereign" in one common sense. *United States* v. *Lara*, 541 U. S. 193, 204 (2004) (quoting *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831)); see *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 56 (1978) ("Congress has plenary

_____

Union. See U. S. Const., Art. IV, §3, cl. 1 ("New States may be admitted by the Congress into this Union"). And indeed, that is the tack the dissent takes. See *post,* at 3–4 (claiming that for this reason the Federal Government is "the 'source' of [later-admitted] States' legislative powers"). But this Court long ago made clear that a new State, upon entry, necessarily becomes vested with all the legal characteristics and capabilities of the first 13. See *Coyle* v. *Smith*, 221 U. S. 559, 566 (1911) (noting that the very meaning of "'a State' is found in the powers possessed by the original States which adopted the Constitution"). That principle of "equal footing," we have held, is essential to ensure that the nation remains "a union of States[ alike] in power, dignity and authority, each competent to exert that residuum of sovereignty not delegated to the United States." *Id.,* at 567; see *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 203 (2009) (referring to the "fundamental principle of equal sovereignty" among the States). Thus, each later-admitted State exercises its authority to enact and enforce criminal laws by virtue not of congressional grace, but of the independent powers that its earliest counterparts both brought to the Union and chose to maintain. See *Coyle*, 221 U. S., at 573 ("[W]hen a new State is admitted into the Union, it is so admitted with all the powers of sovereignty and jurisdiction which pertain to the original States"). The dissent's contrary view—that, say, Texas's or California's powers (including the power to make and enforce criminal law) derive from the Federal Government—contradicts the most fundamental conceptual premises of our constitutional order, indeed the very bedrock of our Union.

authority to limit, modify or eliminate the [tribes'] powers of local self-government"). But unless and until Congress withdraws a tribal power—including the power to prosecute—the Indian community retains that authority in its earliest form. See *Wheeler*, 435 U. S., at 323. The "ultimate source" of a tribe's "power to punish tribal offenders" thus lies in its "primeval" or, at any rate, "pre-existing" sovereignty: A tribal prosecution, like a State's, is "attributable in no way to any delegation . . . of federal authority." *Id.*, at 320, 322, 328; *Santa Clara Pueblo*, 436 U. S., at 56. And that alone is what matters for the double jeopardy inquiry.

Conversely, this Court has held that a municipality cannot qualify as a sovereign distinct from a State—no matter how much autonomy over criminal punishment the city maintains. See *Waller*, 397 U. S., at 395. Florida law, we recognized in our pivotal case on the subject, treated a municipality as a "separate sovereign entit[y]" for all relevant real-world purposes: The city possessed broad home-rule authority, including the power to enact criminal ordinances and prosecute offenses. *Id.,* at 391. But that functional control was not enough to escape the double jeopardy bar; indeed, it was wholly beside the point. The crucial legal inquiry was backward-looking: Did the city and State ultimately "derive their powers to prosecute from independent sources of authority"? *Heath*, 474 U. S., at 90 (describing *Waller*'s reasoning). Because the municipality, in the first instance, had received its power from the State, those two entities could not bring successive prosecutions for a like offense.

And most pertinent here, this Court concluded in the early decades of the last century that U. S. territories—including an earlier incarnation of Puerto Rico itself—are not sovereigns distinct from the United States. In *Grafton* v. *United States*, 206 U. S. 333, 355 (1907), we held that the Philippine Islands (then a U. S. territory, also ac-

quired in the Spanish-American War) could not prosecute a defendant for murder after a federal tribunal had acquitted him of the same crime. We reasoned that whereas "a State does not derive its powers from the United States," a territory does: The Philippine courts "exert[ed] all their powers by authority of" the Federal Government. *Id.,* at 354. And then, in *Shell Co.*, we stated that "[t]he situation [in Puerto Rico] was, in all essentials, the same." 302 U. S., at 265. Commenting on a Puerto Rican statute that overlapped with a federal law, we explained that this "legislative duplication [gave] rise to no danger of a second prosecution" because "the territorial and federal laws [were] creations emanating from the same sovereignty." *Id.*, at 264; see also *Heath*, 474 U. S., at 90 (noting that federal and territorial prosecutors "d[o] not derive their powers to prosecute from independent sources of authority").[5]

————————

[5] The dissent's theory, see *supra,* at 7, n. 2, cannot explain any of these (many) decisions, whether involving States, Indian tribes, cities, or territories. We have already addressed the dissent's misunderstanding with respect to the States, including the later-admitted ones. See *supra,* at 8, and n. 4. This Court's reasoning could not have been plainer: The States (*all* of them) are separate sovereigns for double jeopardy purposes not (as the dissent claims) because they exercise authority over criminal law, but instead because that power derives from a source independent of the Federal Government. See *Heath*, 474 U. S., at 89. So too for the tribes, see *supra,* at 9–10; and, indeed, here the dissent's contrary reasoning is deeply disturbing. According to the dissent, Congress is in fact "the 'source' of the Indian tribes' criminal-enforcement power" because it has elected not to disturb the exercise of that authority. *Post,* at 5. But beginning with Chief Justice Marshall and continuing for nearly two centuries, this Court has held firm and fast to the view that Congress's power over Indian affairs does nothing to gainsay the profound importance of the tribes' pre-existing sovereignty. See *Worcester* v. *Georgia*, 6 Pet. 515, 559–561 (1832); *Talton* v. *Mayes*, 163 U. S. 376, 384 (1896); *Michigan* v. *Bay Mills Indian Community*, 572 U. S. \_\_\_, \_\_\_–\_\_\_ (2014) (slip op., at 4–5). And once again, we have stated in no uncertain terms that the tribes are separate sovereigns precisely because of that inherent authority. See *Wheeler*,

### B

With that background established, we turn to the question presented: Do the prosecutorial powers belonging to Puerto Rico and the Federal Government derive from wholly independent sources? See Brief for Petitioner 26–28 (agreeing with that framing of the issue). If so, the criminal charges at issue here can go forward; but if not, not. In addressing that inquiry, we do not view our decisions in *Grafton* and *Shell Co.* as, in and of themselves, controlling. Following 1952, Puerto Rico became a new kind of political entity, still closely associated with the United States but governed in accordance with, and exercising self-rule through, a popularly ratified constitution. The magnitude of that change requires us to consider the dual-sovereignty question anew. And yet the result we reach, given the legal test we apply, ends up the same. Puerto Rico today has a distinctive, indeed exceptional, status as a self-governing Commonwealth. But our approach is historical. And if we go back as far as our doctrine demands—to the "ultimate source" of Puerto Rico's

―――――――

435 U. S., at 328. Next, the dissent cannot (and does not even try to) explain our rule that a municipality is not a separate sovereign from a State. See *supra,* at 10. As this Court has explicitly recognized, many cities have (in the words of the dissent's test) wide-ranging "authority to make and enforce [their] own criminal laws," *post,* at 5; still, they cannot undertake successive prosecutions—because they received that power from state governments, see *Waller*, 397 U. S., at 395. And likewise (finally), the dissent fails to face up to our decisions that the territories are not distinct sovereigns from the United States because the powers they exercise are delegations from Congress. See *Grafton* v. *United States*, 206 U. S. 333, 355 (1907); *supra,* at 10–11. That, of course, is what makes them different from the current Philippines, see *post*, at 2–3, whose relevance here is hard to fathom. As an independent nation, the Philippines wields prosecutorial power that is not traceable to any congressional conferral of authority. And that, to repeat, is what matters: If an entity's capacity to make and enforce criminal law ultimately comes from another government, then the two are not separate sovereigns for double jeopardy purposes.

prosecutorial power, *Wheeler*, 435 U. S., at 320—we once again discover the U. S. Congress.

Recall here the events of the mid-20th century—when Puerto Rico, just as petitioner contends, underwent a profound change in its political system. See Brief for Petitioner 1–2 ("[T]he people of Puerto Rico[] engaged in an exercise of popular sovereignty . . . by adopting their *own* Constitution establishing their *own* government to enact their *own* laws"); *supra,* at 3–4. At that time, Congress enacted Public Law 600 to authorize Puerto Rico's adoption of a constitution, designed to replace the federal statute that then structured the island's governance. The people of Puerto Rico capitalized on that opportunity, calling a constitutional convention and overwhelmingly approving the charter it drafted. Once Congress approved that proposal—subject to several important conditions accepted by the convention—the Commonwealth, a new political entity, came into being.

Those constitutional developments were of great significance—and, indeed, made Puerto Rico "sovereign" in one commonly understood sense of that term. As this Court has recognized, Congress in 1952 "relinquished its control over [the Commonwealth's] local affairs[,] grant[ing] Puerto Rico a measure of autonomy comparable to that possessed by the States." *Examining Bd. of Engineers, Architects and Surveyors* v. *Flores de Otero*, 426 U. S. 572, 597 (1976); see *id.,* at 594 ("[T]he purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union"); *Rodriguez* v. *Popular Democratic Party*, 457 U. S. 1, 8 (1982) ("Puerto Rico, like a state, is an autonomous political entity, sovereign over matters not ruled by the [Federal] Constitution" (internal quotation marks omitted)). That newfound authority, including over local criminal laws, brought mutual benefit to the Puerto Rican people and the entire United States.

See Brief for United States as *Amicus Curiae* 3. And if our double jeopardy decisions hinged on measuring an entity's self-governance, the emergence of the Commonwealth would have resulted as well in the capacity to bring the kind of successive prosecutions attempted here.

But as already explained, the dual-sovereignty test we have adopted focuses on a different question: not on the fact of self-rule, but on where it came from. See *supra,* at 7–8. We do not care, for example, that the States presently exercise autonomous control over criminal law and other local affairs; instead, we treat them as separate sovereigns because they possessed such control as an original matter, rather than deriving it from the Federal Government. See *supra*, at 8–9. And in identifying a prosecuting entity's wellspring of authority, we have insisted on going all the way back—beyond the immediate, or even an intermediate, locus of power to what we have termed the "ultimate source." *Wheeler*, 435 U. S., at 320. That is why we have emphasized the "inherent," "primeval," and "pre-existing" capacities of the tribes and States—the power they enjoyed prior to the Union's formation. *Id.*, at 322–323, 328; *Heath*, 474 U. S., at 90; *Santa Clara Pueblo*, 436 U. S., at 56; see *supra*, at 8–10. And it is why cities fail our test even when they enact and enforce their own criminal laws under their own, popularly ratified charters: Because a State must initially authorize any such charter, the State is the furthest-back source of prosecutorial power. See *Waller*, 397 U. S., at 391–394; *supra*, at 10.

On this settled approach, Puerto Rico cannot benefit from our dual-sovereignty doctrine. For starters, no one argues that when the United States gained possession of Puerto Rico, its people possessed independent prosecutorial power, in the way that the States or tribes did upon becoming part of this country. Puerto Rico was until then a colony "under Spanish sovereignty." Treaty of Paris,

Art. 2, 30 Stat. 1755. And local prosecutors in the ensuing decades, as petitioner itself acknowledges, exercised only such power as was "delegated by Congress" through federal statutes. Brief for Petitioner 28; see *Shell Co.*, 302 U. S., at 264–265; *supra,* at 10–11. Their authority derived from, rather than pre-existed association with, the Federal Government.

And contrary to petitioner's claim, Puerto Rico's transformative constitutional moment does not lead to a different conclusion. True enough, that the Commonwealth's power to enact and enforce criminal law now proceeds, just as petitioner says, from the Puerto Rico Constitution as "ordain[ed] and establish[ed]" by "the people." P. R. Const., Preamble; see Brief for Petitioner 28–30. But that makes the Puerto Rican populace only the most immediate source of such authority—and that is not what our dual-sovereignty decisions make relevant. Back of the Puerto Rican people and their Constitution, the "ultimate" source of prosecutorial power remains the U. S. Congress, just as back of a city's charter lies a state government. *Wheeler*, 435 U. S., at 320. Congress, in Public Law 600, authorized Puerto Rico's constitution-making process in the first instance; the people of a territory could not legally have initiated that process on their own. See, *e.g., Simms* v. *Simms*, 175 U. S. 162, 168 (1899). And Congress, in later legislation, both amended the draft charter and gave it the indispensable stamp of approval; popular ratification, however meaningful, could not have turned the convention's handiwork into law.[6] Put simply, Congress con-

———————

[6] Petitioner's own statements are telling as to the role Congress necessarily played in this constitutional process. See, *e.g.*, Reply Brief 1–2 ("Pursuant to Congress' invitation, and with Congress' consent, the people of Puerto Rico engaged in an exercise of popular sovereignty"); *id.,* at 7 ("The Commonwealth's legal cornerstone is Public Law 600"); Tr. of Oral Arg. 19 (describing the adoption of the Puerto Rico Constitution as "pursuant to the invitation of Congress and with the blessing of

ferred the authority to create the Puerto Rico Constitu-
tion, which in turn confers the authority to bring criminal
charges. That makes Congress the original source of
power for Puerto Rico's prosecutors—as it is for the Fed-
eral Government's. The island's Constitution, significant
though it is, does not break the chain.

Petitioner urges, in support of its different view, that
Congress itself recognized the new Constitution as "a
democratic manifestation of the [people's] will," Brief for
Petitioner 2—but far from disputing that point, we readily
acknowledge it to be so. As petitioner notes, Public Law
600 affirmed the "principle of government by consent" and
offered the Puerto Rican public a "compact," under which
they could "organize a government pursuant to a constitu-
tion of their own adoption." §1, 64 Stat. 319; see Brief for
Petitioner 2, 29; *supra,* at 3. And the Constitution that
Congress approved, as petitioner again underscores, de-
clares that "[w]e, the people" of Puerto Rico, "create" the
Commonwealth—a new political entity, "republican in
form," in which the people's will is "sovereign[]" over the
government. P. R. Const., Preamble and Art. I, §§1–2; see
Brief for Petitioner 2, 29–30; *supra,* at 4. With that
consented-to language, Congress "allow[ed] the people of
Puerto Rico," in petitioner's words, to begin a new chapter
of democratic self-governance. Reply Brief 20.

All that separates our view from petitioner's is what
that congressional recognition means for Puerto Rico's
ability to bring successive prosecutions. We agree that
Congress has broad latitude to develop innovative ap-
proaches to territorial governance, see U. S. Const., Art.
IV, §3, cl. 2; that Congress may thus enable a territory's
people to make large-scale choices about their own politi-
cal institutions; and that Congress did exactly that in
enacting Public Law 600 and approving the Puerto Rico

———————

Congress").

Constitution—prime examples of what Felix Frankfurter once termed "inventive statesmanship" respecting the island. Memorandum for the Secretary of War, in Hearings on S. 4604 before the Senate Committee on Pacific Islands and Porto Rico, 63d Cong., 2d Sess., 22 (1914); see Reply Brief 18–20. But one power Congress does not have, just in the nature of things: It has no capacity, no magic wand or airbrush, to erase or otherwise rewrite its own foundational role in conferring political authority. Or otherwise said, the delegator cannot make itself any less so—no matter how much authority it opts to hand over. And our dual-sovereignty test makes this historical fact dispositive: If an entity's authority to enact and enforce criminal law ultimately comes from Congress, then it cannot follow a federal prosecution with its own. That is true of Puerto Rico, because Congress authorized and approved its Constitution, from which prosecutorial power now flows. So the Double Jeopardy Clause bars both Puerto Rico and the United States from prosecuting a single person for the same conduct under equivalent criminal laws.

## III

Puerto Rico boasts "a relationship to the United States that has no parallel in our history." *Examining Bd.*, 426 U. S., at 596. And since the events of the early 1950's, an integral aspect of that association has been the Commonwealth's wide-ranging self-rule, exercised under its own Constitution. As a result of that charter, Puerto Rico today can avail itself of a wide variety of futures. But for purposes of the Double Jeopardy Clause, the future is not what matters—and there is no getting away from the past. Because the ultimate source of Puerto Rico's prosecutorial power is the Federal Government—because when we trace that authority all the way back, we arrive at the doorstep of the U. S. Capitol—the Commonwealth and the United

States are not separate sovereigns.  That means the two governments cannot "twice put" respondents Sánchez Valle and Gómez Vázquez "in jeopardy" for the "same offence."  U. S. Const., Amdt. 5.  We accordingly affirm the judgment of the Supreme Court of Puerto Rico.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–108

_____

## COMMONWEALTH OF PUERTO RICO, PETITIONER *v.* LUIS M. SANCHEZ VALLE, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF PUERTO RICO

[June 9, 2016]

JUSTICE GINSBURG, with whom JUSTICE THOMAS joins, concurring.

I join in full the Court's opinion, which cogently applies long prevailing doctrine. I write only to flag a larger question that bears fresh examination in an appropriate case. The double jeopardy proscription is intended to shield individuals from the harassment of multiple prosecutions for the same misconduct. *Green* v. *United States*, 355 U. S. 184, 187 (1957). Current "separate sovereigns" doctrine hardly serves that objective. States and Nation are "kindred systems," yet "parts of ONE WHOLE." The Federalist No. 82, p. 245 (J. Hopkins ed., 2d ed. 1802) (reprint 2008). Within that whole is it not "an affront to human dignity," *Abbate* v. *United States*, 359 U. S. 187, 203 (1959) (Black, J., dissenting), "inconsistent with the spirit of [our] Bill of Rights," Developments in the Law—Criminal Conspiracy, 72 Harv. L. Rev. 920, 968 (1959), to try or punish a person twice for the same offense? Several jurists and commentators have suggested that the question should be answered with a resounding yes: Ordinarily, a final judgment in a criminal case, just as a final judgment in a civil case, should preclude renewal of the fray anyplace in the Nation. See *Bartkus* v. *Illinois*, 359 U. S. 121, 150 (1959) (Black, J., dissenting); *United States* v. *All Assets of G. P. S. Automotive Corp.*, 66 F. 3d 483

(CA2 1995) (Calabresi, J.); Franck, An International Lawyer Looks at the *Bartkus* Rule, 34 N. Y. U. L. Rev. 1096 (1959); Grant, Successive Prosecutions by State and Nation: Common Law and British Empire Comparisons, 4 UCLA L. Rev. 1 (1956); Grant, The *Lanza* Rule of Successive Prosecutions, 32 Colum. L. Rev. 1309 (1932). See also 6 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §25.5(a), p. 851 (4th ed. 2015) ("Criticism of *Abbate*['s separate sovereign exception] intensified after the Supreme Court held that the Double Jeopardy Clause of the Fifth Amendment was also applicable to the states . . . ." (citing, *inter alia,* Braun, Praying to False Sovereigns: The Rule Permitting Successive Prosecutions in the Age of Cooperative Federalism, 20 Am. J. Crim. L. 1 (1992))). The matter warrants attention in a future case in which a defendant faces successive prosecutions by parts of the whole USA.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–108

_____

COMMONWEALTH OF PUERTO RICO, PETITIONER *v.*
LUIS M. SANCHEZ VALLE, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
PUERTO RICO

[June 9, 2016]

JUSTICE THOMAS, concurring in part and concurring in the judgment.

The Court today concludes that the Commonwealth of Puerto Rico and the United States are not separate sovereigns because the Federal Government is the ultimate source of Puerto Rico's authority to prosecute crimes. *Ante*, at 16. I agree with that holding, which hews to the Court's precedents concerning the Double Jeopardy Clause and U. S. Territories. But I continue to have concerns about our precedents regarding Indian law, see *United States* v. *Lara*, 541 U. S. 193, 214–226 (2004) (opinion concurring in judgment), and I cannot join the portions of the opinion concerning the application of the Double Jeopardy Clause to successive prosecutions involving Indian tribes. Aside from this caveat, I join the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–108

_____

## COMMONWEALTH OF PUERTO RICO, PETITIONER *v.* LUIS M. SANCHEZ VALLE, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
PUERTO RICO

[June 9, 2016]

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR joins, dissenting.

I agree with the Court that this case poses a special, not a general, question about Puerto Rico's sovereignty. It asks whether "the prosecutorial powers belonging to Puerto Rico and the Federal Government derive from wholly independent sources." *Ante,* at 12. I do not agree, however, with the majority's answer to that question. I do not believe that "if we go back [through history] as far as our doctrine demands" (*i.e.,* "all the way back" to the "furthest-back source of prosecutorial power"), we will "discover" that Puerto Rico and the Federal Government share the same source of power, namely, "the U. S. Congress." *Ante,* at 12–13, 14. My reasons for disagreeing with the majority are in part conceptual and in part historical.

## I

Conceptually speaking, the Court does not mean literally that to find the "source" of an entity's criminal law, we must seek the "*furthest-back* source of . . . power." *Ante,* at 14 (emphasis added). We do not trace Puerto Rico's source of power back to Spain or to Rome or to Justinian, nor do we trace the Federal Government's source of power back to the English Parliament or to William the Conqueror or to King Arthur. Rather the Court's statement means that we

should trace the source of power back to a time when a previously nonexistent entity, or a previously dependent entity, became independent—at least, sufficiently independent to be considered "sovereign" for purposes of the Double Jeopardy Clause.

As so viewed, this approach explains the Court's decisions fairly well. The Federal Government became an independent entity when the Constitution first took effect. That document gave to the Federal Government the authority to enact criminal laws. And the Congress that the document created is consequently the source of those laws. The original 13 States, once dependents of Britain, became independent entities perhaps at the time of the Declaration of Independence, perhaps at the signing of the Treaty of Paris, perhaps with the creation of the Articles of Confederation. (I need not be precise.) See G. Wood, Creation of the American Republic 1776–1787, p. 354 (1969) ("The problem of sovereignty was not solved by the Declaration of Independence. It continued to be the most important theoretical question of politics throughout the following decade"). And an independent colony's legislation-creating system is consequently the source of those original State's criminal laws.

But the "source" question becomes more difficult with respect to other entities because Congress had an active role to play with respect to their creation (and thus congressional activity appears to be highly relevant to the double jeopardy question). Consider the Philippines. No one could doubt the Philippines' current possession of sovereign authority to enact criminal laws. Yet if we trace that power back through history, we must find the "furthest-back" source of the islands' lawmaking authority, not in any longstanding independent Philippine institutions (for until 1946 the Philippines was dependent, not independent), but in a decision by Congress and the President (as well as by the Philippines) to change the Philip-

pines' status to one of independence. In 1934 Congress
authorized the President to "withdraw and surrender all
right of . . . sovereignty" over the Philippines. 48 Stat.
463, codified at 22 U. S. C. §1394. That authorization
culminated in the Treaty of Manila, signed in 1946 and
approved by Congress that same year, which formally
recognized the Philippines as an independent, self-
governing nation-state. See 61 Stat. 1174. In any obvious
sense of the term, then, the "source" of the Philippines'
independence (and its ability to enact and enforce its own
criminal laws) was the U. S. Congress.

The same is true for most of the States. In the usual
course, a U. S. Territory becomes a State within our Union
at the invitation of Congress. In fact, the parallels be-
tween admission of new States and the creation of the
Commonwealth in this case are significant. Congress
passes a law allowing "the inhabitants of the territory . . .
to form for themselves a constitution and state govern-
ment, and to assume such name as they shall deem proper."
Act of Apr. 16, 1818, ch. 67, 3 Stat. 428–429 (Illinois);
see also Act of June 20, 1910, ch. 310, 36 Stat. 557 (New
Mexico) ("[T]he qualified electors of the Territory . . . are
hereby authorized to vote for and choose delegates to form
a constitutional convention for said Territory for the pur-
pose of framing a constitution for the proposed State of
New Mexico"). And after the Territory develops and pro-
poses a constitution, Congress and the President review
and approve it before allowing the Territory to become a
full-fledged State. See, *e.g.,* Res. 1, 3 Stat. 536 (Illinois);
Pub. Res. 8, 37 Stat. 39 (New Mexico); Presidential Proc-
lamation No. 62, 37 Stat. 1723 ("I WILLIAM HOWARD
TAFT, . . . declare and proclaim the fact that the funda-
mental conditions imposed by Congress on the State of
New Mexico to entitle that State to admission have been
ratified and accepted"). The Federal Government thus is
in an important sense the "source" of these States' legisla-

tive powers.

One might argue, as this Court has argued, that the source of new States' sovereign authority to enact criminal laws lies in the Constitution's equal-footing doctrine—the doctrine under which the Constitution treats new States the same as it does the original 13. See *ante,* at 9, n. 4. It is difficult, however, to characterize a constitutional insistence upon equality of the States as (in any here relevant sense) the "*source*" of those States' independent legislative powers. For one thing, the equal-footing doctrine is a requirement imposed by the U. S. Constitution. See *Coyle* v. *Smith,* 221 U. S. 559, 566–567 (1911). For that reason, the *Constitution* is ultimately the source of even these new States' equal powers (just as it is the source of Congress' powers). This is not to suggest that we are not a "'union of States [alike] in power, dignity and authority.'" *Ante,* at 9, n. 4 (quoting *Coyle, supra,* at 567). Of course I recognize that we are. It is merely to ask: without the Constitution (*i.e.,* a *federal* "source"), what claim would new States have to a lawmaking power equal to that of their "earliest counterparts"? *Ante,* at 9, n. 4.

For another thing, the equal-footing doctrine means that, going forward, new States must enjoy the same rights and obligations as the original States—they are, for example, equally restricted by the First Amendment and equally "competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself." *Coyle, supra,* at 567. But this current and future equality does not destroy the fact that there is a federal "source" from which those rights and obligations spring: the Congress which agreed to admit those new States into the Union in accordance with the Constitution's terms. See, *e.g.,* 37 Stat. 39 ("The Territor[y] of New Mexico [is] hereby admitted into the Union upon an equal footing with the original States").

In respect to the Indian tribes, too, congressional action

is relevant to the double jeopardy analysis. This Court
has explained that the tribes possess an independent
authority to enact criminal laws by tracing the source of
power back to a time of "'primeval'" tribal existence when
"'the tribes were self-governing sovereign political com-
munities.'" *Ante,* at 9–10 (quoting *United States* v.
*Wheeler*, 435 U. S. 313, 322–323 (1978)). But as the Court
today recognizes, this prelapsarian independence must be
read in light of congressional action—or, as it were, inac-
tion. That is because—whatever a tribe's history—
Congress maintains "plenary authority to limit, modify or
eliminate the [tribes'] powers of local self-government,"
*Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 56 (1978),
and thus the tribes remain sovereign for purposes of the
Double Jeopardy Clause only "until" Congress chooses to
withdraw that power, *ante,* at 10. In this sense, Congress'
pattern of inaction (*i.e.,* its choice to refrain from with-
drawing dual sovereignty) amounts to an implicit decision
to *grant* such sovereignty to the tribes. Is not Congress
then, in this way, the "source" of the Indian tribes' criminal-
enforcement power?

  These examples illustrate the complexity of the question
before us. I do not believe, as the majority seems to be-
lieve, that the double jeopardy question can be answered
simply by tracing Puerto Rico's current legislative powers
back to Congress' enactment of Public Law 600 and calling
the Congress that enacted that law the "source" of the
island's criminal-enforcement authority. That is be-
cause—as with the Philippines, new States, and the In-
dian tribes—congressional activity and other historic cir-
cumstances can combine to establish a *new* source of
power. We therefore must consider Public Law 600 in the
broader context of Puerto Rico's history. Only through
that lens can we decide whether the Commonwealth,
between the years 1950 and 1952, gained sufficient sover-
eign authority to become the "source" of power behind its

own criminal laws.

## II

The Treaty of Paris, signed with Spain in 1898, said that "[t]he civil rights and political status" of Puerto Rico's "inhabitants . . . shall be determined by the Congress." Art. 9, 30 Stat. 1759. In my view, Congress, in enacting the Puerto Rican Federal Relations Act (*i.e.,* Public Law 600), determined that the "political status" of Puerto Rico would for double jeopardy purposes subsequently encompass the sovereign authority to enact and enforce—pursuant to its *own* powers—its own criminal laws. Several considerations support this conclusion.

*First*, the timing of Public Law 600's enactment suggests that Congress intended it to work a significant change in the nature of Puerto Rico's political status. Prior to 1950 Puerto Rico was initially subject to the Foraker Act, which provided the Federal Government with virtually complete control of the island's affairs. In 1917 Puerto Rico became subject to the Jones Act, which provided for United States citizenship and permitted Puerto Ricans to elect local legislators but required submission of local laws to Congress for approval. In 1945 the United States, when signing the United Nations Charter, promised change. It told the world that it would "develop self-government" in its Territories. Art. 73(b), 59 Stat. 1048, June 26, 1945, T. S. No. 993 (U. N. Charter). And contemporary observers referred to Public Law 600 as taking a significant step in the direction of change by granting Puerto Rico a special status carrying with it considerable autonomy. See, *e.g.,* Magruder, The Commonwealth Status of Puerto Rico, 15 U. Pitt. L. Rev. 1, 14–16 (1953); see also L. Kalman, Abe Fortas: A Biography 170–171 (1990) ("[After the 1950 'compact,'] Puerto Rico was self-ruling, according to [Fortas], although the federal government retained the same power it would have over states in a union").

*Second*, Public Law 600 uses language that says or implies a significant shift in the legitimacy-conferring source of many local laws. The Act points out that the United States "has progressively recognized the right of self-government of the people of Puerto Rico." 64 Stat. 319. It "[f]ully recogniz[es] the principle of government by consent." 48 U. S. C. §731b. It describes itself as being "in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption." *Ibid.* It specifies that the island's new constitution must "provide a republican form of government," §731c; and this Court has characterized that form of government as including "the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves," *In re Duncan*, 139 U. S. 449, 461 (1891).

*Third*, Public Law 600 created a constitution-writing process that led Puerto Rico to convene a constitutional convention and to write a constitution that, in assuring Puerto Rico independent authority to enact many local laws, specifies that the legitimacy-conferring source of much local lawmaking shall henceforth be the "people of Puerto Rico." The constitution begins by stating:

> "We, the people of Puerto Rico, in order to organize ourselves politically on a fully democratic basis, to promote the general welfare, and to secure for ourselves and our posterity the complete enjoyment of human rights, placing our trust in Almighty God, do ordain and establish this Constitution for the commonwealth . . . .
>
> .          .          .          .          .
>
> "We understand that the democratic system of government is one in which the will of the people is the

source of public power." P. R. Const., Preamble (1952).

The constitution adds that the Commonwealth's "political power emanates from the people and shall be exercised in accordance with their will," Art. I, §1; that the "government of the Commonwealth of Puerto Rico shall be republican in form and its legislative, judicial and executive branches . . . shall be equally subordinate to the sovereignty of the people of Puerto Rico," Art. I, §2; and that "[a]ll criminal actions in the courts of the Commonwealth shall be conducted in the name and by the authority of 'The People of Puerto Rico,'" Art. VI, §18.

At the same time, the constitutional convention adopted a resolution stating that Puerto Rico should be known officially as "'The Commonwealth of Puerto Rico'" in English and "'El Estado Libre Asociado de Puerto Rico'" in Spanish. Resolution 22, in Documents on the Constitutional Relationship of Puerto Rico and the United States 192 (M. Ramirez Lavandero ed., 3d ed. 1988). The resolution explained that these names signified "a politically organized community . . . in which political power resides ultimately in the people, hence a free state, but one which is at the same time linked to a broader political system in a federal or other type of association and therefore does not have independent and separate existence." *Id.,* at 191.

*Fourth*, both Puerto Rico and the United States ratified Puerto Rico's Constitution. Puerto Rico did so initially through a referendum held soon after the constitution was written and then by a second referendum held after the convention revised the constitution in minor ways (ways that Congress insisted upon, but which are not relevant here). See 66 Stat. 327; see also *ante,* at 3 (describing these revisions). Congress did so too by enacting further legislation that said that the "constitution of the Commonwealth of Puerto Rico . . . shall become effective when

the Constitutional Convention of Puerto Rico shall have declared in a formal resolution its acceptance . . . of the conditions of approval herein contained." 66 Stat. 327–328. And, as I have just said, the convention, having the last word, made the minor amendments and Puerto Rico ratified the constitution through a second referendum.

*Fifth*, all three branches of the Federal Government subsequently recognized that Public Law 600, the Puerto Rican Constitution, and related congressional actions granted Puerto Rico considerable autonomy in local matters, sometimes akin to that of a State. See, *e.g.,* S. Rep. No. 1720, 82d Cong., 2d Sess., 6 (1952) ("As regards local matters, the sphere of action and the methods of government bear a resemblance to that of any State of the Union"). Each branch of the Federal Government subsequently took action consistent with that view.

As to the Executive Branch, President Truman wrote to Congress that the Commonwealth's constitution, when enacted and ratified, "vest[s] in the people of Puerto Rico" complete "authority and responsibility for local self-government." Public Papers of the Presidents, Apr. 22, 1952, p. 287 (1952–1953). Similarly, President Kennedy in 1961 circulated throughout the Executive Branch a memorandum that said:

> "The Commonwealth structure, and its relationship to the United States which is in the nature of a compact, provide for self-government in respect of internal affairs and administration, subject only to the applicable provisions of the Federal Constitution, the Puerto Rican Federal Relations Act [*i.e.,* Public Law 600], and the acts of Congress authorizing and approving the constitution.

> .          .          .          .          .

> "All departments, agencies, and officials of the executive branch of the Government should faithfully

and carefully observe and respect this arrangement in relation to all matters affecting the Commonwealth of Puerto Rico." 26 Fed. Reg. 6695.

Subsequent administrations made similar statements. See Liebowitz, The Application of Federal Law to the Commonwealth of Puerto Rico, 56 Geo. L. J. 219, 233, n. 60 (1967) (citing message from President Johnson).

The Department of State, acting for the President and for the Nation, wrote a memorandum to the United Nations explaining that the United States would no longer submit special reports about the "economic, social, and educational conditions" in Puerto Rico because Puerto Rico was no longer a non-self-governing Territory. U. N. Charter, Art. 73(e) (requiring periodic reports concerning such Territories). Rather, the memorandum explained that Puerto Rico had achieved "the full measure of self-government." Memorandum by the Government of the United States of America Concerning the Cessation of Transmission of Information Under Article 73(e) of the Charter With Regard to the Commonwealth of Puerto Rico, in A. Fernós-Isern, Original Intent in the Constitution of Puerto Rico 154 (2d ed. 2002). The memorandum added that "Congress has agreed that Puerto Rico shall have, under [its] Constitution, freedom from control or interference by the Congress in respect to internal government and administration." *Id.,* at 153.

The United Nations accepted this view of the matter, the General Assembly noting in a resolution that "the people of the Commonwealth of Puerto Rico . . . have achieved a new political status." Resolution 748 VIII, in *id.,* at 142. The General Assembly added that "the people of the Commonwealth of Puerto Rico have been invested with attributes of political sovereignty which clearly identify the status of self-government attained by the Puerto Rican people as that of an autonomous political entity."

*Ibid.*; see also United Nations and Decolonization, Trust and Non-Self-Governing Territories (1945–1999), online at http://www.un.org/en/decolonization/nonselfgov.shtml (as last visited June 3, 2016) (noting that Puerto Rico underwent a "Change in Status" in 1952, "after which information was no longer submitted to the United Nations" concerning this former "[t]rusteeship").

The Department of Justice, too, we add, until this case, argued that Puerto Rico is, for Double Jeopardy Clause purposes, an independently sovereign source of its criminal laws. See, *e.g., United States* v. *Lopez Andino*, 831 F. 2d 1164, 1168 (CA1 1987) (accepting the Government's position that "Puerto Rico is to be treated as a state for purposes of the double jeopardy clause"), cert. denied, 486 U. S. 1034 (1988).

As to the Judicial Branch, this Court has held that Puerto Rico's laws are "state statutes" within the terms of the Three-Judge Court Act. See *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663 (1974). In doing so, we wrote that the 1952 events had led to "significant changes in Puerto Rico's governmental structure"; that the Commonwealth had been "'organized as a body politic by the people of Puerto Rico under their own constitution'"; and that these differences distinguish Puerto Rico's laws from those of other Territories, which are "'subject to congressional regulation.'" *Id.,* at 672–673; see also, *e.g., Examining Bd. of Engineers, Architects and Surveyors* v. *Flores de Otero*, 426 U. S. 572, 597 (1976) (Congress granted Puerto Rico "a measure of autonomy comparable to that possessed by the States"); *Rodriguez* v. *Popular Democratic Party*, 457 U. S. 1, 8 (1982) ("Puerto Rico, like a State, is an autonomous political entity, sovereign over matters not ruled by the [Federal] Constitution" (internal quotation marks omitted)).

Finally, as to the Legislative Branch, to my knowledge since 1950 Congress has never—I repeat, *never*—vetoed or

modified a local criminal law enacted in Puerto Rico.

*Sixth*, Puerto Rico's Supreme Court has consistently held, over a period of more than 50 years, that Puerto Rico's people (and not Congress) are the "source" of Puerto Rico's local criminal laws. See, *e.g., Pueblo* v. *Castro Garcia*, 20 P. R. Offic. Trans. 775, 807–808 (1988) ("Puerto Rico's . . . criminal laws . . . emanate from a different source than the federal laws"); *R. C. A. Communications, Inc.* v. *Government of the Capital*, 91 P. R. R. 404, 415 (1964) (transl.) (Puerto Rico's "governmental powers . . . flow from itself and from its own authority" and are not "merely delegated by Congress"); *Ramirez de Ferrer* v. *Mari Bras*, 144 D. P. R. 141, ___, 1997 WL 870836, *4 (Westlaw transl.) (Puerto Rico's "governmental powers . . . emanate from the will of the people of Puerto Rico"); see also *Pueblo* v. *Figueroa*, 77 P. R. R. 175, 183 (1954) (finding that it was "impossible to believe that" the Puerto Rican Constitution is "in legal effect" simply "a Federal law"); cf. *Figueroa* v. *Puerto Rico*, 232 F. 2d 615, 620 (CA1 1956) ("[T]he constitution of the Commonwealth is not just another Organic Act of Congress" "though congressional approval was necessary to launch it forth").

*Seventh*, insofar as Public Law 600 (and related events) grants Puerto Rico local legislative autonomy, it is particularly likely to have done so in respect to local criminal law. That is because Puerto Rico's legal system arises out of, and reflects, not traditional British common law (which underlies the criminal law in 49 of our 50 States), but a tradition stemming from European civil codes and Roman law. In 1979 Chief Justice Trías Monge wrote for a unanimous Puerto Rico Supreme Court that the Commonwealth's laws were to be "governed . . . by the civil law system," with roots in the Spanish legal tradition, not by the "common-law principles" inherent in "'American doctrines and theories'" of the law. *Valle* v. *American Int'l Ins. Co.,* 8 P. R. Offic. Trans. 735, 736–738 (1979). Con-

siderations of knowledge, custom, habit, and convention argue with special force for autonomy in the area of criminal law. Cf. *Diaz* v. *Gonzalez*, 261 U. S. 102, 105–106 (1923) (Holmes, J., for the Court) (cautioning that federal courts should not apply "common law conceptions" in Puerto Rico, because the island "inherit[ed]" and was "brought up in a different system from that which prevails here").

I would add that the practices, actions, statements, and attitudes just described are highly relevant here, for this Court has long made clear that, when we face difficult questions of the Constitution's structural requirements, longstanding customs and practices can make a difference. See *NLRB* v. *Noel Canning*, 573 U. S. \_\_\_, \_\_\_–\_\_\_ (2014) (slip op., at 7–8) ("[I]t is equally true that the longstanding practice of the government can inform our determination of what the law is" (citation and internal quotation marks omitted)); see also, *e.g., Mistretta* v. *United States*, 488 U. S. 361, 401 (1989); *Dames & Moore* v. *Regan*, 453 U. S. 654, 686 (1981); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 610–611 (1952) (Frankfurter, J., concurring); *The Pocket Veto Case*, 279 U. S. 655, 689–690 (1929); *Ex parte Grossman*, 267 U. S. 87, 118–119 (1925); *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 472–474 (1915); *McPherson* v. *Blacker*, 146 U. S. 1, 27 (1892); *McCulloch* v. *Maryland*, 4 Wheat. 316, 401 (1819); *Stuart* v. *Laird*, 1 Cranch 299 (1803). Here, longstanding customs, actions, and attitudes, both in Puerto Rico and on the mainland, uniformly favor Puerto Rico's position (*i.e.,* that it is sovereign—and has been since 1952—for purposes of the Double Jeopardy Clause).

This history of statutes, language, organic acts, traditions, statements, and other actions, taken by all three branches of the Federal Government and by Puerto Rico, convinces me that the United States has entered into a compact one of the terms of which is that the "source" of

Puerto Rico's criminal law ceased to be the U. S. Congress and became Puerto Rico itself, its people, and its constitution. The evidence of that grant of authority is far stronger than the evidence of congressional silence that led this Court to conclude that Indian tribes maintained a similar sovereign authority. Indeed, it is difficult to see how we can conclude that the tribes do possess this authority but Puerto Rico does not. Regardless, for the reasons given, I would hold for Double Jeopardy Clause purposes that the criminal law of Puerto Rico and the criminal law of the Federal Government do not find their legitimacy-conferring origin in the same "source."

    I respectfully dissent.